UNITED STATES, Appellee,

v.

Harold W. BUNKLEY, Private First
Class, U. S. Army, Appellant.

No. 32,934.
CM 433223.

U. S. Court of Military Appeals.

Jan. 18, 1982.

For Appellant: *Captain Michael P. La-Haye* (argued); *Captain James. F. Nagle* (reargued); *Colonel Robert B. Clarke, Colonel Edward S. Adamkewicz, Jr., Lieutenant Colonel John R. Thornock, Lieutenant Colonel John F. Lymourner, Major Charles A. Byler, Captain Lawrence E. Wzorek, Captain D. David Hostler* (on briefs); *Captain John H. Milne, Captain Hollis C. Lenus, Jr.*

For Appellee: *Captain Denis L. Durkin* (argued); *Captain Harry J. Gruchala* (reargued); *Colonel Thomas H. Davis, Major John T. Sherwood, Jr., Captain John F. DePue* (on brief); *Colonel R. R. Boller, Major David McNeill, Jr., Major Ted B. Borek, Major John T. Edwards, Major John T. Meixell.*

*Opinion*

COOK, Judge:

Accused seeks reversal of his conviction by general court-martial of larceny and burglary [1] because of alleged invalidity of a search of his rented off-post apartment in Tiefenbach, Federal Republic of Germany.

1. Articles 121 and 129, Uniform Code of Military Justice, 10 U.S.C. §§ 921 and 929, respectively.

He predicates his contention on three alternate grounds (2 M.J. 145), which, in restated order and language, are:

I. That the military officer who authorized the search "was not a neutral and detached magistrate";

II. That the officer "was without authority to authorize the search" because he was precluded from authorizing searches by military regulation and international agreement; and

III. That assuming the authority and the qualifications of the officer, his authorization to search was fatally flawed "because the information" upon which he acted "was provided by an informant whose reliability had not been established."

We decided all contentions against accused.

## I. EFFECT OF THE POSITION AND DUTIES OF THE AUTHORIZING OFFICER

Between initial argument and reargument of the issues, this Court decided *United States v. Ezell*, 6 M.J. 307 (C.M.A.1979). The Court held that, while the normal duties and responsibilities of a military commander are of the sort that would disqualify him in the civilian community from serving "as a neutral and detached magistrate under Fourth Amendment jurisprudence," he is not "*per se* disqualified" to act in that capacity in the military. *Id.* at 318.

Despite contending unwaveringly that the authorizing officer was not a commander within the meaning of *Ezell*, on reargument accused's counsel conceded he could be "equated to ... [a] commanding officer in light of the geographical arrangement" of the command responsibilities that had been necessitated by a tactical operation of accused's unit. Tactical needs may require separation of so-called administrative functions from operational or tactical functions, and command authority can be vested in the officer having responsibility over the administrative functions. *See*

*United States v. Woodward,* 16 U.S.C.M.A. 266, 36 C.M.R. 422 (1966); *United States v. Bunting,* 4 U.S.C.M.A. 84, 15 C.M.R. 84 (1954). We are certain that, if the authorizing officer here had no tactical command authority, his duties, like those of the unit commander discussed in *Ezell,* did not preclude him from acting as a neutral and detached magistrate. *See United States v. Kalscheuer,* 11 M.J. 373, 377 (C.M.A.1981).

## II. POWER OF THE AUTHORIZING OFFICER TO AUTHORIZE A SEARCH

Before examining the evidence as to the power of the authorizing officer to act, we should consider whether we can reach the merits of accused's contention. The respective briefs and arguments of counsel submitted to the trial judge do not mention the officer's authority, or lack of it, under regulation or treaty. Both the briefs and arguments dealt with probable cause and with whether the evidence of the informant's reliability met the standards promulgated by the United States Supreme Court in *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), and *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Now, accused's counsel ask that we consider whether the authorization to search was prohibited both by a treaty provision and a United States Army, Europe, regulation.

■ In my separate opinion in *United States v. Ezell, supra* at 332, I noted that I would not ordinarily consider on appeal "a particular ground" of alleged invalidity of a search unless that ground had been interposed at trial. A specific objection affords the Government the opportunity to present evidence to establish legality; when the Government is deprived of that opportunity, an appellate tribunal is not usually in a position to make an informed judgment. *United States v. Hendrix,* 21 U.S.C.M.A. 412, 45 C.M.R. 186 (1972). In major part, however, the accused's contention rests upon documents that are legal in nature and of a kind that the Court is "bound to take judicial notice of ... as material to

the appeal." *United States v. Schnell,* 1 M.J. 94, 97 (C.M.A.1975) (footnote omitted). In consequence, appellate defense counsel maintain that the reason for the no-objection rule "is not present ... [and] the rule should not be applied." Although I perceive some factual material that the Government might have been able to present had there been a proper particularized objection for each of the present allegations of invalidity, I conclude that the rule should not be invoked because each allegation will stand or fall on legal principles.

### A. *The alleged lack of authority under the regulation*

In October 1974, Special Agent Farmer obtained authorization to search accused's off-post apartment from Major Verdier, who described himself as "Deputy Subcommunity Commander" of the area in which the post and apartment were located. At the time, the Subcommunity Commander was participating in a field exercise away from the community. Verdier testified the Subcommunity Commander had, before he left, also "delegated to ... [him] his authority." Accused's counsel contend that Verdier's authorization of a search is contrary to a United States Army, Europe, regulation.

USAREUR Supplement 1 to AR 190–22 (Dec. 16, 1971) provides for the search of "documented" and "undocumented" premises. Paragraph 2–1c provides:

The following officers may authorize searches ... of individual and family-type billets and quarters ... that are documented for the exclusive use of the US Forces or otherwise occupied by the US Forces as a result of an agreement with the receiving state concerned:

.        .        .        .        .

(2) The community leader, or assistant community leader (USAREUR Reg. 10–20), of the area in which the property is located.

.        .        .        .        .

These officers may delegate to their staff subordinates the authority to authorize search of individual and family-type billets and quarters and the seizure of property resulting from such a search.

Paragraph 2–1e of the regulation relates to a search of premises "not documented for," or occupied by, United States Forces. It provides:

The search of billets or quarters used by US Forces personnel that are not documented for the exclusive use of the US Forces . . . should be under the auspices of and in accordance with the laws of the country in which the property is located. If a search of such billets or quarters is necessary, the appropriate civilian police officials will be requested to make the search. The request will not be made unless probable cause exists as required by . . . [the] basic regulation. Even if host country police are to make the search, *authorization must be obtained from one of the officers listed in c above, this supplement, when the search has been instigated or will be participated in by US authorities.*

Emphasis supplied. ˙

Appellate defense counsel argue that the authorization to search conferred by the regulation does not include a "subcommunity commander." Counsel attach no significance to the difference between Major Verdier's characterization of the subcommunity office head as "commander" and the regulation's characterization of the community head as "leader." We are satisfied that the difference is simply the result of a change in title, effected between the period of the events and the trial, by a superceding USAREUR Regulation 10–20 that was promulgated in June 1975. We are also satisfied that, while USAREUR Supplement 1 refers to an "assistant" leader and Major Verdier described his subordinate status as that of a "deputy," that change also resulted from the change of title accomplished by the successor regulation. *See United States v. Reagan*, 7 M.J. 490, 493 n. 3 (C.M.A.1979) (Cook, J., dissenting). The core of the defense argument is that, as USAREUR Supplement 1 lists only a community leader or assistant among those empowered to authorize a search, Major Verdier and his superior, as subcommunity heads, are necessarily excluded.

■ Essentially, the defense argument is a restatement of a rule of construction often applied in judicial determinations of the meaning of a statute or regulation. The rule holds that the enumeration of particular persons or classes as the subjects of legislative or administrative action implies exclusion of all others. Like all rules of construction, however, this rule is not absolute. Other indicia of a different intention may command an opposite conclusion. Here, the accused's argument disregards the cross-reference in the grant of authority to search to USAREUR Regulation 10–20. The regulation in force at the time of the search also titled the community heads as "Community Leader" and "Subcommunity Leader." USAREUR Regulation 10–20 (Nov. 19, 1971). A "Subcommunity Leader" was defined in paragraph 3d as follows:

An officer, designated by the appointing authority, who has the same responsibilities, prerogatives, and rights as the community leader subject to limitations imposed by the appointing authority, the community leader, and this or other applicable regulations. *Hereafter, the term community leader as used in this regulation means the community/subcommunity leader.*

Emphasis supplied.

Paragraph 1 of the regulation sets forth its purpose; paragraph 2 states the geographic boundaries of its applicability; and paragraph 3 is titled, "Explanation of Terms Used." Succeeding paragraphs spell out the missions, functions, and responsibilities of the various authorities mentioned in the regulation, including the "Community Leader." The pattern of the regulation reinforces the express language of paragraph 3d that the subcommunity leader and the deputy subcommunity leader have "the same responsibilities, prerogatives, and rights" as the community leader and assistant community leader, respectively. We

are convinced, therefore, that the reference in paragraph 2–1c(2), USAREUR Supplement 1 to AR 190–22, to USAREUR Regulation 10–20 was a shorthand expression of the intention of the draftsmen of the Supplement to emphasize that the term "Community Leader" had the same meaning that it had in Regulation 10–20. The actions of those responsible for applying the Supplement provisions confirm the text intention.

Special Agent Farmer, who sought the search authority, testified that he went to the district to obtain search authorization. His testimony indicates he understood that the Subcommunity Leader was the proper official to provide the authority. When he determined that the Subcommunity Leader "was in the field," he applied to Major Verdier, as the Deputy Subcommunity Leader.

█ Major Verdier testified that he had been in the subcommunity for about 15 months. During that period he was "aware of . . . situations in which . . . [the Subcommunity Leader] authorized searches." He expressly informed Agent Farmer that, as Deputy Subcommunity Leader, he had authority to authorize a search. We conclude, therefore, that Major Verdier had authority to authorize the search under USAREUR

Supplement 1. *United States v. Kalscheuer, supra* at 380.

B. *The alleged invalidity of the search under international agreement*

In *United States v. Mitchell,* 21 U.S.C.M.A. 340, 342, 45 C.M.R. 114, 116 (1972), the Court noted that "whether and under what condition" an American commander of forces present in a foreign country "can lawfully authorize an off-post search of a private dwelling in . . . [that] country is dependent upon international agreement or arrangement between the involved countries, where such exists." Two pertinent international agreements exist between the Federal Republic of Germany and the United States. The first is the Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces (NATO SOFA), 4 U.S.T. 1792, T.I.A.S. No. 2846 (effective date—August 23, 1953); the second is an Agreement to Supplement the Agreement between the Parties to the North Atlantic Treaty regarding the Status of their Forces with respect to Foreign Forces stationed in the Federal Republic of Germany (Supplementary Agreement), 14 U.S.T. 531, T.I.A.S. No. 5351 (effective date—July 1, 1963). The material provisions of each are set out below.

| NATO SOFA | Supplementary Agreement to NATO SOFA |
|---|---|
| Article II | |
| It is the duty of a force . . . to respect the law of the receiving State, and to abstain from any spirit activity inconsistent with the present Agreement. | |
| [*Id.* at 1796.] | |
| Article VII | Article 3 |
| 6.–(a) The authorities of the receiving and sending States shall assist each other in the carrying out of all necessary investigations into offenses, and in the collection and production of evidence, including the seizure . . . of objects connected with an offense. | 1. In accordance with the obligations imposed by the North Atlantic Treaty upon the contracting parties thereto to render mutual assistance, the German authorities and the authorities of the forces shall cooperate closely to ensure the implementation of . . . [SOFA] and of the present Agreement. |
| [*Id.* at 1800.] | [*Id.* at 539 (footnote omitted).] |
| | . . . . . |
| | 3. The German authorities and the authorities of a force shall, by taking appropriate |

NATO SOFA

Supplementary Agreement to NATO SOFA

measures, ensure close and reciprocal liaison within the scope of the cooperation provided for in paragraphs 1 and 2 of this Article.

[*Id.* at 539–40.]

. . . . .

7. If, in the implementation of . . . [SOFA] and of the present Agreement, no agreement is reached either on the local or on the regional level between the German authorities and the authorities of a force, the matter shall, unless . . . [SOFA] or the present Agreement provides a special procedure, be referred to the competent central Federal authority and the higher authority of the force.

[*Id.* at 540–41.]

. . . . .

### Article 28

10.–(a) Regularly constituted military units . . . shall have the right to police any camps, establishments or other premises which they occupy as the result of an agreement with the receiving State. The military police of the force may take all appropriate measures to ensure the maintenance of order and security on such premises.

(b) Outside these premises, such military police shall be employed only subject to arrangements with the authorities of the receiving State and in liaison with those authorities, and in so far as such employment is necessary to maintain discipline and order among the members of the force.

[*Id.* at 1802.]

1. The military police of a force shall have the right to patrol on public roads, on public transport, in restaurants (Gaststätten) and in all other places to which the public has access and to take such measures with respect to the members of a force, . . . as are necessary to maintain order and discipline. Insofar as it is necessary or expedient the details of the exercise of this right shall be agreed upon between the German authorities and the authorities of the force, who shall maintain close mutual liaison.

[*Id.* at 559–60.]

***

■ Events after argument of accused's appeal have overrun major parts of his contention that the search of his off-base apartment was in violation of international agreement. We have decided *United States v. Whiting*, 12 M.J. 253 (C.M.A.1982), and *United States v. Morris*, 12 M.J. 262 (C.M.A.1982). Those cases hold that a violation by a contracting party of a provision of Article VII of NATO SOFA, or the Supplementary Agreement with Germany "derived therefrom,"[2] confers no right upon an individual serviceman to object, on that ground, to the admission

of evidence obtained in a search of his off-base private dwelling that was conducted pursuant to a search authorization by a competent military commander. As no right to assert an exclusionary rule for an alleged violation of Article VII is set forth in the Article or in the Supplementary Agreement, I need not be detained by accused's particular contention that, under paragraph 10.–(b) of Article VII, off-base action by military law enforcement authorities must be pursuant to written "arrangments" or "liaison" with the German authorities.[3]

2. *United States v. Whiting*, 12 M.J. 253, 255 (C.M.A.1982).

3. It has been suggested that to deny standing to challenge an American military search of an off-base private dwelling to an American ser-

vice member occupant on the ground of failure to effect a prior written arrangement or liaison with the German authorities would eventually encourage American authorities to disregard their treaty obligations. I detect nothing in this record or in those of *United States v. Whiting*,

Appellate defense counsel contend that CID Agent Farmer's search was illegal because it violated Article 28 of the Supplementary Agreement. According to counsel, Article 28 forbids use of members of the military police for any purpose but patrol of public ways and public places. If that contention is correct, Article 28 would deny authority to military policemen to carry out a valid authorization to search the off-base private dwelling of an American service member.

The Fourth Amendment to the United States Constitution is silent as to who may execute a validly issued search warrant. The United States Code enumerates the persons empowered to serve a warrant and, with a single particularized exception, directs that "no other person" may do so. 18 U.S.C. § 3105. Federal courts have held that execution of a valid warrant by an unauthorized person is illegal and evidence seized in the search is inadmissible at trial. *Perry v. United States,* 14 F.2d 88 (9th Cir. 1926); *Leonard v. United States,* 6 F.2d 353 (1st Cir. 1925). *See* Fed.R.Crim.P. 41(c) and (h); *United States v. Martin,* 600 F.2d 1175 (5th Cir. 1979). I assume, but do not decide, that if Article 28 were intended to impose the same sort of limitation upon American military police in Germany as 18 U.S.C. § 3105 imposes upon civilian authorities, the individual subject to the search would have standing to object to it. *See United States v. Morris, supra* at 246 n. 3; and *United States v. Mitchell, supra* at 343, 45 C.M.R. at 117 (which held that a military commander otherwise possessing authority to order a search of off-base private premises occupied by a service member in a foreign country could not exercise that authority in

the face of a treaty provision and Executive Order issued pursuant thereto which allowed a search only on a warrant issued by a court of the Civil Administration). Mil.R. Evid. 315(h) is consistent with that assumption. Subparagraph (h)(3) deals with a search within a foreign country. It provides:

> Noncompliance with such an agreement [in respect to execution of a search authorization] does not make an otherwise lawful search [or seizure] unlawful.

Subparagraph (h)(4), however, acknowledges that,

> exclusion of evidence . . . [may result if] required by the Constitution of the United States or an applicable Act of Congress.

A treaty, like an act of Congress, is part of "the supreme Law of the Land." U.S. Const. art. VI. If construed as accused construes it, Article 28 of the Supplementary Agreement may also require exclusion.

The search here was carried out by a CID agent. Although not informed of the command relationship between the Army Criminal Investigation Detachment and the military police, I assume that a CID agent can be classified as a military policeman within the meaning of Article 28. Records before the Court indicate that CID agents participate in a great many—perhaps most— searches in civilian communities in the Federal Republic of Germany and other SOFA countries. Accused's construction of Article 28, therefore, conflicts with established practice. Defense counsel argue, however, that the practice may have been sanctioned by SOFA alone, but the Supplementary

*supra,* and *United States v. Morris,* 12 M.J. 262 (C.M.A.1982), that even hints at a disposition on the part of American military enforcement personnel to evade or avoid the obligations of NATO SOFA and the Supplementary Agreement. More importantly, this Court has construed SOFA as authorizing oral arrangements and liaisons. *United States v. Carter,* 16 U.S.C.M.A. 277, 279–81, 287–88, 36 C.M.R. 433, 435–37, 443–44 (1966) (Quinn, C. J., concurring). *See United States v. DeLeo,* 5 U.S.C.M.A. 148, 17 C.M.R. 148 (1954). The Supplementary Agreement indicates that when

an agreement is to be in writing, language is used to express that requirement. For example, in regard to a determination of jurisdiction over offenses, Articles 17 and 18 require a certificate by the sending State setting forth specified matters. 14 U.S.T. at 551–52. It is apparent, therefore, that when the draftsmen intended an interchange between the authorities to be in writing, they explicitly so provided; when they did not specify the form, they intended the authorities to choose their own form, whether oral or written, or partly oral and partly written.

Agreement forbids it in Germany. To support the argument, they refer us to the summary Text of the Steering Committee's discussions on the draft of the Supplementary Agreement. The notes show that, at a session on March 5, 1956, the German delegate agreed to referral to the Administrative Committee of the proposal by the Canadian delegate on the use of military police. In his remarks, the German delegate expressed his belief "that the activities of the military police should be restricted to public roads, ... [places of public resort], and means of transportation ... as provided in Article 23 of the Forces Convention" (page 1192). After an initial draft, the Administrative Committee reported an approved draft to the Steering Committee. As indicated in the comparison set out below, the text of the draft relevant here is not the same as the text of Article 28 of the Supplementary Agreement; the text of Article 28 is substantially like the text of Article 23 of the predecessor Convention.

| Administrative Committee's Draft on Article 28 (May 2, 1956). | Convention on the Rights and Obligations of Foreign Forces and Their Members in the Federal Republic of Germany. 6 U.S.T. 5608, T.I.A.S. No. 3425 (October 23, 1954). | Supplementary Agreement to NATO SOFA |
|---|---|---|
| Article VII Paragraph 10/B/ | Article 23 Police of the Forces | Article 28 |
| The military police of a force shall have the right to patrol on public ways, on public transport, in restaurants, and in all other places to which the public has access, in order to maintain order and discipline among the members of a force or a civilian component or dependents. So far as necessary or expedient, the details of the exercise of this right shall be agreed upon between the German authorities and the authorities of the force, who will maintain close mutual liaison. | 1. The competent agencies of the Forces shall have the right to patrol on public ways, in places of public resort and on public transport in the Federal territory *and* to take action with respect to members of the Forces, in order to maintain order and discipline. [*Id.* at 5621 (emphasis supplied).] | 1. The military police of a force shall have the right to patrol on public roads, on public transport, in restaurants (Gaststätten) and in all other places to which the public has access *and* to take such measures with respect to the members of a force, of a civilian component or dependents as are necessary to maintain order and discipline. Insofar as it is necessary or expedient the details of the exercise of this right shall be agreed upon between the German authorities and the authorities of the force, who shall maintain close mutual liaison. [14 U.S.T. 559–60 (emphasis supplied).] |

If, as appellate defense counsel contend, Article 28 of the Supplementary Agreement was intended to lessen the powers possessed by the military police under Article 23 of the 1954 Convention, we should expect the language of the two to be materially different, but they are not. The opening words of Article 23 and Article 28 are different, but, in substance, the phrase "competent agencies of the Forces," used in Article 23, under the title "Police of the Forces," is not different in meaning from "military police of a force," used in Article 28. Similarly, the public areas enumerated in Article 23 are somewhat differently stated in Article 28, but all are public places. We come then to the critical point of the agreement between Article 23 and Article 28 that is not in the Administrative Committee's draft. In both articles the provision on patrol of public places is followed by the provision "and to take such measures with respect to members of a force ... as are necessary to maintain order and discipline," or words to

that effect. The draft is entirely different; it does not authorize another action that the military police can take in addition to patrol of public places, but prescribes the purpose for which public patrol can be undertaken. Unlike the text of former Article 23, and Article 28 of the Supplementary Agreement, the draft has no "and" between the patrol provision and the remainder of the proposal. Also different is the arrangement of the clauses of the remaining language. Manifestly, the operative language of the Administrative Committee's draft was not adopted. To me, the ineluctable conclusion is that the operative language of the previous Convention was continued, and accompanying the carry-over of language was a purpose to carry over the prevailing practice.

Military police are engaged in enforcement procedures wholly removed from patrol of public places. We know from our own and civilian cases that drug transactions present special risks to the armed forces and are a major enforcement problem. *See Schlesinger v. Councilman*, 420 U.S. 738, 760 n. 34, 95 S.Ct. 1300, 1314, n. 34, 43 L.Ed.2d 591 (1975); *United States v. Alef*, 3 M.J. 414, 418 (C.M.A.1977); *United States v. Beeker*, 18 U.S.C.M.A. 563, 40 C.M.R. 275 (1969). We have held that transactions in a civilian community in a foreign country are subject to court-martial. Frequently, undercover agents in drug enforcement are obliged to enter private premises in the course of their enforcement duties. As construed by accused, Article 28 prohibits such entry and renders any evidence obtained by the undercover agent inadmissible in evidence. Under accused's construction of the article, a military policeman cannot enter a nonpublic area in pursuit of a service member he has seen commit an offense in a public area nor can the military policeman on patrol enter private premises to ask the occupants whether they had witnessed, through a window, the commission of an offense on the public way. As the Federal Republic of Germany has waived, in advance, jurisdiction over offenses as to which it would otherwise have had concurrent jurisdiction

with a visiting force, almost 99 percent of the cases against a force member are prosecuted by the military. *United States v. Schnell, supra* at 97. Accused's construction of Article 28 seriously hampers the investigative capability of a visiting force in instances of the kind mentioned. A construction that results in such adverse effects should be eschewed, if any other reasonable construction free of such consequence is apparent.

As I construe Article 28, it does not prohibit use of military police other than for patrol in public places. The article authorizes military police "to take such measures with respect to the members of a force . . . as are necessary to maintain order and discipline," provided those measures were "agreed upon between the German authorities and the authorities of the force, who shall maintain close mutual liaison." The agreement contemplated is an agreement between local authorities and the practice before the Supplementary Agreement allowed military police to participate in the search of private premises; the language of the Supplementary Agreement is the same as the similar provision in the Convention that regulated the previous practice. I, unhesitatingly, conclude that Agent Farmer's involvement in the search did not violate Article 28 of the Agreement.

Summarizing my views of the search:

■ 1. I do not regard the arrangement with the German Chief of Police and the Chief's detail of two uniformed policemen to accompany Agent Farmer as transforming the search into "a foreign search," which, under *United States v. Jordan*, 1 M.J. 334 (C.M.A.1976), would render the admissibility of evidence obtained in the search subject to "prerequisite" proof "that the search . . . was lawful, applying the law of . . . [the foreign] sovereign." *Id.* at 338. *See United States v. Morrison*, 12 M.J. 272 (C.M.A.1982).

■ 2. I do not perceive that Article 28 denies authority to a military policeman to execute a valid authorization to search a private, off-base dwelling of an American service member.

3. Article 28 does not establish civilian premises occupied by a servicemember as a privileged sanctuary against entry by an American military law enforcement agent. Consequently, I am certain Article 28 does not forbid any military law enforcement agent from entering such premises to conduct a search authorized by a competent military authority.

## III. RELIABILITY OF THE INFORMANT AS AFFECTING THE SEARCH AUTHORIZATION

Agent Farmer apprised Major Verdier of a report he had received to the effect that sometime between 10:45 p.m. and 7:45 a.m. a large quantity of stereo equipment had been stolen from two rooms in McKee Barracks, and that about 4:00 a.m., the accused and two companions were carrying a great deal of such electronic equipment into accused's apartment, which was in the civilian community about 2 miles from the barracks. Farmer had obtained the information from a German civilian who occupied an apartment in the same building as the accused. He believed but was "not positive" he told Major Verdier that the informant was a German civilian. However, Major Verdier testified he was informed the informant had been at the scene and had witnessed the carrying-in of the equipment, which required "2 trips," but he was not then told the informant was a German civilian. Both Farmer and Verdier agreed that Verdier had been told that Farmer obtained the information directly from the informant.

▇ Relying upon many cases, including *Aguilar v. Texas, supra,* and *United States v. Gamboa,* 23 U.S.C.M.A. 83, 48 C.M.R. 591 (1974), appellate defense counsel contend that Major Verdier did not have sufficient evidence of the informant's reliability to warrant his reliance upon the information the informant had provided. The trial judge examined Major Verdier on the matter and upheld his authorization to search. Ample evidence supports his ruling.[4]

Major Verdier testified that the informant's detailed description of the items in accused's possession matched corresponding details as to the stolen items. The correspondence convinced him the informant had observed the incident "from . . . very close by." Considering the time and place, he reasoned that the informant was either an accomplice in the crime or a civilian, but that it was more likely he was a civilian. A report by either provided sufficient reliability as to its probable truthfulness to justify Major Verdier's acceptance of it. An accomplice would not likely implicate himself in a criminal act by a false report; status as a "civilian informant," that is, one with no known involvement in activities that would reasonably cast doubt on his truthfulness, imparts reliability to a report that is internally consistent and not self-contradictory. *United States v. Melvin,* 596 F.2d 492 (1st Cir. 1979), *cert. denied,* 444 U.S. 837, 100 S.Ct. 73, 62 L.Ed.2d 48 (1979); *United States v. McCrea,* 583 F.2d 1083 (9th Cir. 1978).

The decision of the United States Army Court of Military Review is affirmed.

EVERETT, Chief Judge (concurring in the result):

Authorization to search was obtained from Major Verdier, an officer who, under the applicable regulations and the circumstances then existing, was empowered to give such authorization. For reasons lucidly explained by Major Verdier in his testi-

---

4. In upholding the search, the trial judge referred to paragraph 152, Manual for Courts-Martial, United States, 1969 (Revised edition), and remarked that Major Verdier was an "officer in charge." The paragraph vests such an officer with authority to order a search. The accused maintains that the position of "officer in charge" exists only in the maritime forces and the Marine Corps. *See* Article 1(4), UCMJ, 10 U.S.C. § 801(4). Oppositely, government counsel argue that, as used in paragraph 152, the term is more inclusive. Whatever the scope of the Manual term, in the context in which the search issue was litigated, the judge apparently intended it to specify an officer in command of the subcommunity. As Major Verdier was indisputably in that position when he authorized the search, he acted in conformity with USAREUR Supplement 1 to AR190–22, paragraph 2–1c.

mony at the suppression hearing and incorporated in the military judge's ruling, probable cause existed to authorize the search, since the information provided by the informant was amply corroborated by other evidence of which Verdier had been made aware. *Cf. Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). The presence of German police during the search leaves little doubt that the search was performed in accord with American treaty obligations and the arrangements made to implement those obligations; but even if this were not the case, appellant could not benefit therefrom. *United States v. Whiting*, 12 M.J. 253 (C.M.A.1982).

FLETCHER, Judge (concurring in the result):

I disagree with the majority opinion's position in *United States v. Whiting*, 12 M.J. 253 (C.M.A.1982), and accordingly cannot join in affirming appellant's conviction on this basis. See *United States v. Whiting, supra* (Fletcher, J., dissenting).

The lead opinion herein, authored by Judge Cook, further evokes my opposition. He concluded in summation that Article 28, NATO SOFA Supplementary Agreement with Germany,[1] as a matter of federal law, does not *forbid* our military police agents with proper command authorization from entering and searching the off-base private home of an American service member which is situated in the Federal Republic of

Germany. In my mind, the more critical question to address, in terms of accepted principles of international law and our treaty agreements, is what provision *authorized* our government agents to search and seize the property of American service members located on private premises in this foreign country? See *United States v. Whiting, supra* (Fletcher, J., dissenting). In any event, both of us have occasion to turn to the treaty agreements with the Federal Republic of Germany.

My Brother Judge also opined that authority to search in these private premises could be found in the following words of Article 28:

> and to take such measures with respect to the members of a force . . . as are necessary to maintain order and discipline . . . [provided those measures were] agreed upon between the German authorities and the authorities of the force, who shall maintain close mutual liaison.

14 U.S.T. 531, 559–60. These words, taken in their proper context, clearly delineate the direct right of American military authorities to police on public ways in the Federal Republic of Germany. See *Text of Negotiating History of NATO SOFA Supplementary Agreement with Germany*, Summary Record of Proceeding 1192 (1956). See also Lazareff, *Status of Military Forces Under Current International Law* 251–54 (1971). Moreover, similar language was used in Article VII, paragraph 10.–(b) of the NATO SOFA[2] to restrict, not expand, the condi-

1. Agreement to Supplement the Agreement Between the Parties to the North Atlantic Treaty regarding the Status of Their Forces with respect to Foreign Forces stationed in the Federal Republic of Germany (Supplementary Agreement), 14 U.S.T. 531, 559–60, T.I.A.S. No. 5351 (effective date July 1, 1963):

Article 28

1. *The military police of a force shall have the right to patrol on public roads, on public transport, in restaurants (Gaststätten) and in all other places to which the public has access and to take such measures with respect to the members of a force, of a civilian component or dependents as are necessary to maintain order and discipline.* Insofar as it is necessary or expedient the details of the exercise of this right shall be agreed upon be-

tween *the German authorities and the authorities of the force, who shall maintain close mutual liaison.* [Emphasis added.]

2. If public order and safety are endangered or disturbed by an incident in which members of a force or of a civilian component or dependents are involved, the military police of a force shall, if so requested by the German authorities, take appropriate measures with respect to such persons to maintain or restore order and discipline.

2. Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces (NATO SOFA), 4 U.S.T. 1792, 1802, T.I.A.S. No. 2846 (effective date August 23, 1953):

tional employment of military police by the sending state outside military installations in the receiving state. *See* Lazareff, *supra* at 254–56. Accordingly, I find his interpretation of the language unacceptable.

Nevertheless, my Brother Judge places great weight in reaching his conclusions on similar language employed in Article 23, *Convention on the Rights and Obligations of Foreign Forces and their Members in the Federal Republic of Germany*[3], and his unsupported assertions as to previous practice in Germany prior to the Supplementary Agreement. He overlooks the fact that Article 7, paragraph 3(c), which appeared in the Forces Convention, states:

> The official quarters of a member of the Forces, or where there are none the residence occupied by him with permission of the authorities of the Force, may not be searched by German authorities, except at the request of the authorities of the Forces. If such residence of the member of the Forces is not an installation, either his consent or that of the authorities of the Forces to the search shall be sufficient.

Such a provision, unlike Article 23, Forces Convention, or Article 28, Supplementary Agreement, clearly demarcated American military authority over the private premises of American service members in the Federal Republic of Germany. This provision, however, is not restated anywhere in the NATO SOFA Supplementary Agreement and the Forces Convention ceased to be effective on the date the Supplementary Agreement entered into force. In the absence of such a provision, and in view of the general purpose of the Supplementary Agreement to implement the NATO SOFA in the Federal Republic of Germany, little

support actually exists for his "continuing practice" theory.

There is a difference, however, between the facts in appellant's case and those considered in *United States v. Whiting, supra,* and *United States v. Reagan,* 7 M.J. 490 (C.M.A.1979). Here the record reveals that Agent Farmer, a military police investigator, not only had a search authorization from the appropriate military commander, *but he also sought permission from the local foreign police chief to search this off-base apartment.* This police chief assigned two of his own uniformed policemen to observe this search, and they also assisted the military police investigators in entering the apartment. In the above-mentioned cases, no such evidence of mutual police cooperation and consent in the gathering of criminal evidence was presented by the Government. There the record indicated that the military police took direct action on the authority of the military commander alone in executing that off-base foreign search of a private residence. *See United States v. Whiting, supra. Cf. United States v. Carter,* 16 U.S.C.M.A. 277, 280, 36 C.M.R. 433, 436 (1966).

These facts are critical to my conclusion as a matter of law in appellant's case that Agent Farmer's search of this off-base apartment was pursuant to an international agreement (*United States v. Mitchell,* 21 U.S.C.M.A. 340, 45 C.M.R. 114 (1972)), and in accordance with service regulations. *United States v. Dillard,* 8 M.J. 213 (C.M.A. 1980). They are decisive in my conclusion that Article 28, NATO SOFA Supplementary Agreement with Germany, is not applicable in this particular factual situation because we are not concerned with *any direct right* of the military police to enter private

---

Article VII

10.–(a) Regularly constituted military units or formations of a force shall have the right to police any camps, establishments or other premises which they occupy as the result of an agreement with the receiving State. The military police of the force may take all appropriate measures to ensure the maintenance of order and security on such premises.

(b) Outside these premises, such military police shall be employed *only* subject to ar-

rangements with the authorities of the receiving State and in liaison with those authorities, *and in so far as such employment is necessary to maintain discipline and order among the members of the force.* [Emphasis added.]

3. 6 U.S.T. 5608, 5621, T.I.A.S. No. 3425 (May 5, 1955).

residences in Germany. *See* Lazareff, *supra.*

Instead, we are concerned with the mutual obligation of military forces and German authorities to "assist each other in the carrying out of...investigations into offenses, and in the collection and...[handing over] of evidence." Article VII, para. 6.–(a), NATO SOFA.[4] More specifically, we are concerned with the conditional use of American military police outside the military installation and the public way in the Federal Republic of Germany with the consent of German authorities. Article VII,

**4.** NATO SOFA, 4 U.S.T. at 1800:

Article VII

6.–(a) The authorities of the receiving and sending States shall assist each other in the carrying out of all necessary investigations into offenses, and in the collection and production of evidence, including the seizure and, in proper cases, the handing over of objects connected with an offense. The handing over of such objects may, however, be made subject to their return within the time specified by the authority delivering them.

**5.** *See* n. 2.

**6.** Para. 2–1a, Army Regulation 190–22 (June 12, 1970) (emphasis supplied):

The commanding officer having jurisdiction over the place where the property is situated or, if the property is in a foreign country or in occupied territory, over personnel subject to military law (or the law of war) who have control or possession of the property may authorize a search of such property.... *When the person or property is located in a foreign country, the commander will authorize a search only when such action is authorized by an international agreement or arrangement with the authorities of the foreign country.*
b. ... *When the person or property is located in a foreign country, commanders will direct military personnel to accompany civil police in the execution of a search warrant when such action is consented to by the foreign country or is authorized by a treaty, agreement, or policy arrangement.*

para. 10.–(b), NATO SOFA.[5] Acknowledgement of these facts makes it unnecessary to engage in Judge Cook's tortuous interpretation of Article 28, NATO SOFA, Supplementary Agreement. The course of action pursued by military authorities in this case was also in accordance with Army Regulations which are supportive of my interpretation of the applicable treaty provisions.[6] I also believe this foreign search, requested by American military police, met fourth amendment standards. *See United States v. Jordan,* 1 M.J. 334, 338 (C.M.A. 1976).

Para. 2–1e, USAREUR Supplement 1 to AR 190–22 (16 Dec. 1971):

e. American military personnel have limited jurisdiction to search economy billets or quarters, whether privately rented by US Forces or leased by the US Forces from private owners. The search of billets or quarters used by US Forces personnel that are not documented for the exclusive use of the US Forces or that are otherwise located outside premises occupied by the US Forces as a result of an international agreement should be under the auspices of and in accordance with the laws of the country in which the property is located. If a search of such billets or quarters is necessary, the appropriate civilian police officials will be requested to make the search. The request will not be made unless probable cause exists as required by...[the] basic regulation. Even if host country police are to make the search, authorization must be obtained from one of the officers listed in...this supplement, when the search has been instigated or will be participated in by US authorities. *The cooperation of the civilian police officials may be anticipated in such cases because of the obligation of their country under paragraph 6(a), article VII, NATO SOFA, to assist in making investigations and "in the collection and production of evidence, including the seizure and, in proper cases, the handing over of objects connected with an offense."* (Emphasis supplied.)
*See* para. 2–1c(2), *supra*; paras. 1(a), 3(b), (c), (d), USAREUR Regulation 10–20 (19 November 1971).