UNITED STATES, Appellee,

v.

Raenell A. CHAPPLE, Disbursing Clerk Seaman Apprentice, U.S. Navy, Appellant.

Nos. 67,527.

NMCM 89–2282.

U.S. Court of Military Appeals.

Argued Nov. 4, 1992.

Decided April 19, 1993.

For Appellant: *Lieutenant Michael C. Pallesen,* JAGC, USNR (argued); *Lieutenant Peter Van Hartesveldt,* JAGC, USNR.

For Appellee: *Lieutenant Dwight N. Mersereau,* JAGC, USNR (argued); *Colonel T.G. Hess,* USMC and *Lieutenant Ralph G. Stiehm,* JAGC, USNR (on brief).

*Opinion of the Court*

GIERKE, Judge:

A military judge sitting as a special court-martial convicted appellant, contrary to his pleas, of failing to obey a regulation;

larceny of a checkbook and attempted larceny of $800; and forgery of a check, in violation of Articles 92, 121, 80, and 123, Uniform Code of Military Justice, 10 USC §§ 892, 921, 880, and 923, respectively. The military judge sentenced appellant to a bad-conduct discharge, confinement and forfeiture of $400.00 pay per month for 4 months, and reduction to the lowest enlisted grade. The convening authority approved the sentence.

In an unpublished opinion dated January 31, 1991, the Court of Military Review set aside the findings of guilty of forgery and of attempted larceny[1] on the ground of insufficient evidence and reassessed the sentence to provide for a bad-conduct discharge, confinement and forfeiture of $200.00 pay per month for 4 months, and reduction to the lowest enlisted grade.

We granted review of the following issue:

WHETHER THE COMMANDING OFFICER, NAVAL SUPPORT ACTIVITY [NAVSUPPACT], NAPLES, WAS EMPOWERED TO AUTHORIZE A SEARCH OF AN OVERSEAS OFF-BASE APARTMENT WHERE NEITHER APPELLANT NOR THE LESSOR OF THE APARTMENT WERE IN HIS CHAIN OF COMMAND.

On January 5, 1988, several crew members of the USS BELKNAP, including Lieutenant Commander (LCDR) McConahy and Disbursing Clerk (DK3) Dacey, reported that their checks had been stolen and that checks drawn on their accounts had been forged and cashed at the USS BELKNAP disbursing office. The Naval Investigative Service (NIS) initiated an investigation and listed appellant as a suspect since he was assigned to the disbursing office during the time the stolen checks were negotiated. The NIS attempted to interview appellant, but he invoked his right to counsel.

On September 19, 1988, the NIS received the report of a handwriting examiner who opined that there were "strong indications" that appellant had forged one of the stolen checks belonging to DK3 Dacey. On September 22, 1988, appellant, wearing Navy dungarees with "R.A. Chapple" stenciled on the shirt, presented LCDR McConahy's checkbook to a teller at the Navy Federal Credit Union in Naples, Italy. Appellant told the teller that LCDR McConahy was his boss and that LCDR McConahy had sent him to obtain additional checks. The teller took one of the deposit slips from the checkbook to verify LCDR McConahy's account, but when she returned appellant had departed the credit union. The teller reported what had happened to the credit union manager, who advised the teller that LCDR McConahy had reported his checks missing and had been transferred from the area approximately 6 months earlier. Appellant's actions at the credit union were reported to the NIS.

The NIS also learned that appellant lived off-base with his fiance, Radioman Seaman (RMSN) Victoria Johns, in an apartment leased by RMSN Johns from an Italian landlord. Her lease was negotiated and prepared through the housing referral office operated by NAVSUPPACT.

The NIS requested authorization from Captain Paron, USN, Commanding Officer, NAVSUPPACT, to search RMSN Johns' apartment for the stolen checks. After being provided with an affidavit relating the foregoing information and consulting with his staff judge advocate, Captain Paron authorized the search. Neither appellant nor RMSN Johns was assigned to NAVSUPPACT. Appellant was assigned to Commander Task Force 63 (CTF 63), and RMSN Johns was assigned to Naval Communications Area Master Station Mediterranean (NAVCAMSMED). However, Captain Paron was designated by Commander-in-Chief United States Naval Forces Europe Instruction (CINCUSNAVEURINST)

---

1. The Court of Military Review dismissed Additional Charge II and its specification. However, Additional Charge II had two specifications; appellant was acquitted of one and convicted of attempt as to the other. By "set[ting] aside the findings of guilty" as to Additional Charge II, the court below made clear that its action referred to specification 2 thereunder.

5450.21D as Senior Officer Present (Administration) for Naples (para. 3c) and the local coordinator for the Naples area, with responsibility for supporting both CTF 63 and NAVCAMSMED.

The NIS agents initially did not rely on the search authorization because RMSN Johns executed a written consent to the search of her apartment. However, she was not able to admit the NIS agents into the apartment because she had left her keys in the apartment. The NIS agents brought appellant to the apartment, ordered him to unlock the entrance, searched the apartment, and found the stolen checks.

CINCUSNAVEURINST 5450.21D tasks NAVSUPPACT to provide numerous support functions to station, tenant, and supported activities, including CTF 63 and NAVCAMSMED. According to paragraph 2 of Enclosure (1) to this Instruction, those support functions include the following:

c. *Facilities support.*

\* \* \*

(6) Operate a housing referral office to provide referrals and accompany prospective tenants to housing areas and to assist with utilities and service contracts, lease negotiations, rental agreements and terminations for U.S. personnel and authorized NATO personnel in the Naples and Gaeta areas.

\* \* \*

j. *Security.*

\* \* \*

(2) Provide physical security for NAVSUPPACT Naples facilities, installations and aircraft from unauthorized access, sabotage, espionage, theft, or other criminal acts; enforce internal security regulations; investigate crimes and prepare investigation reports; maintain good order and discipline; provide for the safety and security of personnel and property; act as liaison with Italian police.

(3) Provide law enforcement support for NAVSUPPACT Naples compounds and areas to include traffic control and accident investigations.

(4) Provide and maintain Military Working Dog kennels and provide detection services for narcotics and explosives to support activities.

\* \* \*

(8) Provide fire prevention and inspection of all buildings utilized by NAVSUPPACT Naples, tenant and supported activities....

(9) Provide motor vehicle registration in compliance with Italian law....

(10) Operate a central motor vehicle registration office....

(11) Provide a motor vehicle safety program....

At trial, appellant contested Captain Paron's authority to authorize a search of the apartment, arguing that Captain Paron was neither RMSN Johns' commander nor appellant's, and that he did not have authority over the property, which was a privately-owned apartment leased and occupied by RMSN Johns.

The military judge denied the motion to suppress the fruits of the search. The military judge ruled that RMSN Johns' consent to the search, "although properly obtained ... was not the means by which the government actually gained entry into the residence." Because RMSN Johns was unable to unlock the apartment, the military judge considered the validity of her consent "mooted" because the NIS, armed with a search authorization, ordered appellant to unlock the apartment. The military judge ruled that the lawfulness of the search rested on the validity of the search authorization.[2] The military judge ruled that Captain Paron had authority to authorize the search because his authority as local coor-

---

**2.** Without deciding whether the military judge correctly ruled that RMSN Johns' consent was "mooted," we accept as the law of the case the military judge's determination that the lawfulness of the search rested on Captain Paron's authority to authorize a search of RMSN Johns' apartment.

dinator "requires him to operate [a] Housing Referral Office" and to "investigate crimes and prepare investigation reports; maintain good order and discipline; provide for the safety and security of personnel and property...."

Mil.R.Evid. 315(d)(1), Manual for Courts–Martial, United States, 1984, provides that a search may be authorized by:

> A commander or other person serving in a position designated by the Secretary concerned as either a position analogous to an officer in charge or a position of command, who has control over the place where the property or person to be searched is situated or found, or, if that place is not under military control, having control over persons subject to military law or the law of war....

■ A commander's search authority extends to nonmilitary property in foreign countries. Mil.R.Evid. 315(c)(4)(B). Even if the search is in violation of a treaty, the North Atlantic Treaty Organization Status of Forces Agreement in this case, that subsection states that appellant has no standing to object on that basis. *See United States v. Whiting*, 12 MJ 253 (CMA 1982); *United States v. Morris*, 12 MJ 262 (CMA 1982).

■ Captain Paron's authority to authorize the search of RMSN Johns' apartment must be based on either his control over RMSN Johns' apartment or his command relationship with RMSN Johns or appellant. We hold that Captain Paron did not have "control" over RMSN Johns' apartment, as that term is used in Mil.R.Evid. 315(d)(1). The sole authority relied upon by the Government, both at trial and before this Court, is Captain Paron's responsibility under CINCUSNAVEURINST 5450.21D to operate a housing referral office. While that directive required Captain Paron to provide assistance to military personnel in finding and contracting for housing, it does not confer any authority over the property leased through the housing referral office.

■ Turning next to Captain Paron's command relationship with RMSN Johns and appellant, it is undisputed that Captain Paron was not in the chain of command for RMSN Johns' unit or appellant's. We hold that Captain Paron's law enforcement support responsibilities under CINCUSNAVEURINST 5450.21D do not make his position analogous to an officer in charge or a position of command. The directive tasks him to provide police and fire protection for supported units but does not vest him with command authority over those units. To the contrary, the directive on which CINCUSNAVEURINST 5450.21D is based, Secretary of the Navy Instruction 5400.14A, directs area coordinators to exercise their authority "through the appropriate chains of command." (Para. 10b.) His responsibility is to support members of tenant and supported units, not to command them. Unlike the "Deputy Subcommunity Commander" in *United States v. Bunkley*, 12 MJ 240, 242 (CMA 1982), Captain Paron was not given specific authority to exercise command or to authorize searches with respect to members of supported units.

■ The Government argues, however, that, even if Captain Paron did not have actual authority to authorize the search, the fruits of the search should be admissible under the good-faith exception. *See* Mil.R.Evid. 311(b)(3). We agree and hold that the good-faith exception applies in this case. Captain Paron was a commander, with general authority to authorize searches. Both he, acting with the advice and assistance of his staff judge advocate, and the NIS agents acted on the erroneous belief that he had authority to authorize the search of RMSN Johns' apartment. The military judge believed that the search authorization was valid. The fact that Captain Paron did not have actual authority over the apartment does not make the fruits of the search inadmissible. *See United States v. Leon*, 468 U.S. 897, 916, 104 S.Ct. 3405, 3417, 82 L.Ed.2d 677 (1984) ("exclusionary rule is designed to deter police misconduct rather than punish ... errors of judges and magistrates"); *see United States v. Mix*, 35 MJ 283 (CMA 1992) (good-faith exception applied as alternative

ground for upholding search where commander reasonably believed he had authority to authorize search of automobile in parking lot jointly used by three units); *People v. Dantzler*, 206 Cal.App.3d 289, 253 Cal.Rptr. 526 (1988) (search conducted in good-faith reliance on improperly issued out-of-county warrant); *State v. Matthieu*, 506 So.2d 1209 (La.1987)(search conducted 100–150 yards outside judicial district). *Compare United States v. Comstock*, 805 F.2d 1194 (5th Cir.1986) (officer thought warrant was issued by state "court of record" in accord with Fed.R.Crim.P. 41), *cert. denied*, 481 U.S. 1022, 107 S.Ct. 1908, 95 L.Ed.2d 513 (1987), *with United States v. Baker*, 894 F.2d 1144 (10th Cir.1990) (officer knew authority of judge to issue warrant was doubtful and so advised judge). *But see Commonwealth v. Shelton*, 766 S.W.2d 628 (Ky.1989) (good-faith exception does not apply when magistrate lacked authority to issue warrant). The weight of authority appears to hold that the good-faith exception applies when a magistrate authorizes a search over a place outside his jurisdiction, if the officers executing the warrant reasonably believe that the magistrate has authority over the place to be searched. Accordingly, we hold that the fruits of the search of RMSN Johns' apartment were properly admitted in evidence.

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

Judges COX, CRAWFORD, and WISS concur.

SULLIVAN, Chief Judge, (concurring in the result):

I disagree with the majority's holding that the Commanding Officer, Naval Support Activity (NAVSUPPACT), Naples, did not have search authority over the off-base housing leased by appellant's military fian-cee. *United States v. Bunkley*, 12 MJ 240 (CMA 1982).

The Commanding Officer, NAVSUP-PACT, as local area coordinator, is responsible, among other tasks and functions, for off-base housing. *See* para. 2c(4)-(6), Enclosure (1) to Commander–in–Chief United States Naval Forces Europe (CINCUS-NAVEUR) Instruction 5450.21D (29 April 1986). Additionally, the Commanding Officer, NAVSUPPACT, is responsible for security in and around the Activity. The duty to "act as liaison with Italian police" suggests that CINCUSNAVEUR contemplated the Commanding Officer, NAVSUP-PACT, as having command responsibility, both on and off base, in the areas of "investigat[ing] crimes and prepar[ing] investigation reports; maintain[ing] good order and discipline; [and] provid[ing] for the safety and security of personnel and property." *See* para. 2j(2), Enclosure (1), *supra*.

In *United States v. Bunkley, supra*, this Court held that "[t]actical needs may require separation of so-called administrative functions from operational or tactical functions, and command authority can be vested in the officer having responsibility over the administrative functions." 12 MJ at 241. The Commanding Officer, NAVSUP-PACT, and appellant's operational commander both had responsibilities that affected appellant. Similarly, the Commanding Officer, NAVSUPPACT, and appellant's fiance's operational commander both had responsibilities that affected appellant's fiance.

Therefore, based on my judgment that the instructions from CINCUSNAVEUR granted search authority to Commanding Officer, Naval Support Activity, Naples, and my reading of *United States v. Bunkley, supra*, I concur in the result reached by the majority.