**UNITED STATES**

v.

**Sergeant Kurt L. WHITING, FR 002–44–2294 United States Air Force.**

**ACM 22521.**

U. S. Air Force Court of Military Review.

Sentence Adjudged 5 Feb. 1979.

Decided 9 Jan. 1980.

Reconsideration Denied 17 March 1980.

Appellate Counsel for the Accused: Colonel B. Ellis Phillips, Colonel Larry G. Stephens and Captain Robert G. Gibson, Jr.

Appellate Counsel for the United States: Colonel Julius C. Ullerich, Jr., Colonel James P. Porter and Captain Robert T. Mounts.

Before EARLY, POWELL and ARRO-WOOD, Appellate Military Judges.

### DECISION

POWELL, Judge:

The accused was tried by general court-martial, with members, and contrary to his pleas, was convicted of one specification of stealing mail matter, one specification of violating 18 U.S.C. Section 793(e) by having unauthorized possession of documents relating to national defense which he willfully and wrongfully retained and failed to deliver to authorized agents, and one specification of failing to obey a lawful general regulation[1] by taking classified documents off base without authority, in violation of Articles 134 and 92, Uniform Code of Military Justice, 10 U.S.C.A. §§ 934, 892.

In their assignment of nine errors, appellate defense counsel invite our attention to the nine errors assigned by trial defense counsel attached to the accused's request for appellate counsel and the trial defense counsel's response to the convening authority's review.[2] Except for those discussed below, the errors assigned are either resolved adversely to the accused or are mooted by our decision.

Trial and appellate defense counsel assert that the military judge erred to the prejudice of the accused by admitting into evidence certain prosecution exhibits which were the product of an illegal search. The objection at trial was on four bases. They were that the base commander who authorized the search was not a neutral and detached magistrate; he did not have the command authority over the accused to authorize the search; there was no probable cause to support the authorization; and policies regarding notification to German authorities in accordance with North Atlantic Treaty Organization Status of Forces Agreement (NATO SOFA) were not followed. We agree with and confine our discussion of the search to the fourth basis of the objection excluding the evidence and do not reach the probable cause issue.

On 19 May 1978, Air Force Office of Special Investigation (OSI) agents at Rhein-Main Air Base, Federal Republic of Germany, received information from an Air Force master sergeant that his wife, who was a German National, had discovered items that appeared to be United States mail matter and classified documents. They were in plastic bags in a storage room at the home of her parents in Grafenhausen, Federal Republic of Germany. Investigation revealed that the accused, who was stationed at Rhein-Main Air Base, resided in an apartment located in the German residence and shared the storage room with his landlord. The storage room was near to, but separated from, the accused's apartment. After briefing Colonel Berg, Base Commander, Rhein-Main Air Base, the agents went to the residence in Grafenhausen where, with the consent of the landlord-owner, they conducted a search of the storage room. They found various items that appeared to be Government property, United States mail matter consisting of opened envelopes and their contents, and classified documents[3] which were contained in plastic bags in a small alcove within the storage room. Early on the following day, Colonel Berg was again briefed and gave his permission to seize the items.[4]

During the afternoon of 20 May 1978, the OSI agents requested authority from Colonel Berg to search the accused's apartment.

---

1. Air Force Regulation 205–1, Information Security Program, paragraph 8–100e, 21 June 1976.

2. *United States v. Goode*, 1 M.J. 3 (C.M.A. 1975).

3. Items in the latter two categories formed the basis for the offenses set forth in Specifications 1 and 2 of Charge I and the Specification of Charge II. With but one exception there was no objection to their admission into evidence. The military judge properly overruled the defense's objection to the item of registered mail which was a flier for a jewelry company and which could be tied to a Navy ring found in the apartment.

4. The validity of this search and the seizure of the items of evidence was not contested either at the trial or on appeal.

After a third briefing, Colonel Berg executed an authority to search and seize. On that same day the agents conducted a search, during which they found and seized one grey United States mail bag, one orange United States mail bag and a jewelry box containing a ring embossed "United States Navy." [5] It is this search of the apartment which the defense contended at trial was illegal and the fruits thereof inadmissible.

Trial defense counsel contended that paragraphs 6(a) and 10(b) of Article VII of the NATO SOFA required as a minimum that liaison with German authorities precede the search of the off-base apartment located in a civilian community and rented by the accused from a German citizen.[6] They claimed the Agreement was not followed, rendering the search defective. The prosecution based the government's authority for the search upon the provisions of the Manual for Courts-Martial, 1969 (Rev.), paragraph 152, as a search of property situated in a foreign country, authorized upon probable cause, by a commanding officer having control over persons subject to military law in that place.

In *United States v. Mitchell*, 21 U.S.C.M.A. 340, 45 C.M.R. 114 (1972), the United States Court of Military Appeals stated: "The question of whether and under what condition a military commander can lawfully authorize an off-post search of a private dwelling in a foreign country is dependent upon international agreement or arrangement between the involved countries, where such exists. This is the expressed teaching of *United States v. Carter*, [16 U.S.C.M.A. 277, 36 C.M.R. 433 (1966)]." The Army Court of Military Review, while following this rule, found further support in the provisions of an Army regulation concerning searches in foreign countries.[7] The absence of an Air Force regulation on the subject calls into question the persuasiveness of the Army decisions and would seem to leave available as authority paragraph 152 of the Manual for Courts-Martial, 1969 (Rev.). However, reliance upon the Manual as authority was specifically urged by the Government but rejected by the Court of Military Appeals in the recent case of *United States v. Reagan*, 7 M.J. 490 (C.M.A. 1979). The Court held: "It is basic to the law, requiring neither cited authority nor extensive comment, that one of the parties

**5.** A witness testified that in March 1978 the various items of registered mail which were discovered and seized during the search of the storage room had been placed in "U.S. MAIL" pouches, the orange one placed inside the grey one, and sealed for dispatch to the indicated destination. The witness recognized her handwriting on the grey pouch's slide label indicating a destination of APO 09520. Both pouches were sealed with metal postal seals which bear serial numbers. Inventories of registered mail, Postal Service Forms 3854, which reflected the registry numbers and the seals' numbers were found in the storage room. These numbers matched those on envelopes and broken seals which were also found in that same location. The destinations of the pouches and their slide labels corresponded to those indicated on the inventories.

**6.** North Atlantic Treaty Organization Status of Forces Agreement (NATO SOFA), Article VII, paragraph 6(a), provides: "The authorities of the receiving and sending States shall assist each other in the carrying out of all necessary investigations into offenses and in the collection and production of evidence, including the seizure and, in proper cases, the handing over

of objects connected with an offence." Paragraph 10(b) of that Article reads:

"Outside these premises, [military camps] such military police shall be employed only subject to arrangements with the authorities of the receiving State and in liaison with those authorities and insofar as such employment is necesary to maintain discipline and order among the members of the force." Additionally, Article 28 of the Supplementary Agreement to the NATO SOFA with Respect to Forces Stationed in the Federal Republic of Germany states: "The military police of a force shall have the right to patrol on public roads, on public transport, in restaurants (Gaststatten) and in all other places to which the public has access and to take such measures with respect to the members of a force, of a civilian component or dependents as are necesary to maintain order and discipline. Insofar as it is necessary or expedient the details of the exercise of the right shall be agreed upon between the German authorities and the authorities of the force, who shall maintain close mutual liaison."

**7.** *United States v. Steed*, 2 M.J. 442 (A.C.M.R. 1975) and *United States v. Carlton*, 2 M.J. 510 (A.C.M.R. 1976).

**504**

to an international treaty cannot enlarge the terms of the original treaty.[8]

The Government had the obligation to show that the contested search was within the purview of the treaty.[9] Review of the record of trial discloses the following extracted cross-examination of Colonel Berg as the only evidence of compliance with the treaty:

Q. [Individual Defense Counsel] Let me ask you. Prior to the military authorities searching this off-base apartment, had the German authorities been notified in any way?

A. The discussion of notifying the German authorities came up and we discussed the legality of the issue of the search and I was advised that I had the search authority. I don't recall at what point in time the German authorities were notified. I think it was on the 20th.

Q. After the search of the apartment?

A. I can't give you a time before or after the search of the apartment. It was after the search of the shed.

Q. And did you yourself notify the German authorities?

A. No, sir.

Q. The protection of classified information was the primary motive in your mind for authorizing the search of this apartment?

A. Yes, sir.

\* \* \* \* \* \*

Q. Can you tell me what, if any, arrangements Rhein-Main Air Force Base has with the German authorities concerning off-base searches of quarters rented by Air Force members?

\* \* \* \* \* \*

Q. Would you you like me to repeat the question?

A. Well, I think I know enough of the question to say that in investigations well, in matters involving coordination with the German police, be it of a vehicle accident or customs violations, or like matters, the policy or procedure we have followed is that the investigating agency will notify or will conduct a coordination with the German side in regard to search or transmitting information back and forth. The base commander does not as a matter of policy pick up the phone and call the 19th District Police to say, here's what we know about this. It is normally our security police investigation section or OSI agents involved.

Q. I see. That is the policy?

A. Yes, sir.

Q. Is that policy embodied in a written directive that you're aware of?

A. No, sir.

■ While the Government did not concede that there was a violation of the treaty, there was no evidence produced which would sustain their burden of showing that the search was conducted in conformance with the treaty. The commander's responses reflecting his reasoning and the failure of the OSI agent's testimony to so indicate, strongly suggest there was no liaison of any kind with the German authorities.[10]

Our rejection of the search renders evidence of the mail bags and ring inadmissi-

---

**8.** The rationale of the dissent in *United States v. Reagan, supra,* does not assist in upholding the search in this case since there is evidence of record which establishes that the accused's apartment was off-base, within the civilian community, and leased from a German landlord.

**9.** *United States v. Reagan, supra,* at page 491.

**10.** We can appreciate the added concern the possible compromise of classified information may have caused the base commander, but do not find any exception in the treaty or other authority to accommodate this concern. This could perhaps have been the subject of agreement between the appropriate authorities had the required liaison occurred or a factor justifying a decision not to use the evidence in a criminal prosecution. Searches by or with the assistance of foreign authorities when sensitive information may be disclosed are not without precedent. See *United States v. Whitler,* 5 C.M.R. 458 (A.F.B.R.1952).

ble. This evidence provided a significant link in the chain of evidence between the accused and the items seized from the storage room which were the subject of the offenses of which the accused stands convicted. Because the accused's guilt is not otherwise established beyond a reasonable doubt, we cannot say that the erroneous admission of this evidence was harmless. For this reason, the findings and sentence will be set aside. Because a rehearing may be ordered, we address two other assignments of error which require consideration should a rehearing be held.

Appellate defense counsel assert that the military judge erred by allowing the prosecution to introduce inadmissible uncharged misconduct, i. e., the presence of various items of what appeared to be government property found in the storage room during the search.

The prosecution first sought the admission of this evidence to show a guilty intent on the part of the accused and the military judge correctly sustained the defense's objection. Counsel next requested its admission during cross-examination of the accused to show common plan, scheme or design as indicative of the accused's intent. After the military judge overruled the defense's objection, the accused was asked about the presence of each of these items in the storage room. The items included: one armed forces courier pouch stenciled ARF-COS; one parachute containing a stock number; one plastic bag containing six pillows, passenger type, each one stenciled MAC, containing federal stock numbers; six boxes of disposable ear protectors containing a federal stock number on each box; one box containing three blankets, each blanket stenciled MAC, and the box containing a federal stock number; one air crew member's oxygen mask with microphone connections; and 223 cans of unlabeled, stenciled Chock-Full-Of-Nuts coffee. Except for plastic bags and the 223 two to three ounce cans of coffee, the accused denied any knowledge of or connection with the remaining items. He stated that the coffee was given to him by persons from In-Flight Kitchen and the plastic bags he obtained from Fleet Services. Following the accused's responses and for the avowed purpose of showing "common plan, scheme and design," impeachment and rebuttal of the accused's testimony, the prosecution, over defense objection, was permitted to recall the OSI agent. He testified that the various items were found in the storage room and in response to a court member's question, explained that, except for the courier pouch, the items were in plastic bags.

In his argument, the assistant trial counsel in referring to the items, stated: "He [the accused] worked down on the flight line where he had access to all of this." He continued: "Each of those items can help to prove his guilt if he knew about them." The military judge instructed the court that the evidence of the presence of these items in the storage area used by the accused could be considered for the limited purpose of tending to identify the accused as the perpetrator of the offenses. He told them that they were not to infer that the accused has an evil disposition of criminal propensity and therefore conclude he committed the offenses charged.

Ordinarily, evidence of uncharged misconduct is not admissible as proof of guilt of an offense charged. It is admissible, when it has substantial value as tending to prove something other than a fact to be inferred from the accused's disposition to commit acts of the kind charged or criminal acts in general. Examples of admissibility are set out in the Manual for Courts-Martial, 1969 (Rev.) paragraph 138g. *United States v. Pavoni*, 5 U.S.C.M.A. 591, 18 C.M.R. 215 (1955); *United States v. Carrier*, 50 C.M.R. 135 (A.F.C.M.R.1975); *United States v. Butcher*, 1 M.J. 554 (A.F.C.M.R. 1975); and *United States v. Poinsett*, 3 M.J. 697 (A.F.C.M.R.1977). Further, evidence of uncharged misconduct must be "plain, clear and conclusive" and connected with the charged offense in point of time. *United States v. Janis*, 1 M.J. 395 (C.M.A.1976); *United States v. Butcher, supra*; and *United States v. Kelley*, 7 U.S.C.M.A. 584, 23

C.M.R. 48 (1957). Evidence of a vague and uncertain character regarding the extraneous offense is never admissible. *United States v. James,* 3 M.J. 851 (A.C.M.R.1977).

■ There is no showing in the record that these items which appeared to be government property were either stolen or missing or had been wrongfully possessed. There is no indication that the items had any prior connection in time or location with the items which were the subject matter of the charged offenses. During cross-examination, the accused admitted to possession of the cans of coffee and the plastic bags only. His denial of any criminality respecting the remaining items left to conjecture that other misconduct had in fact occurred and that he participated in it. *United States v. Arevalo,* 11 U.S.C.M.A. 417, 29 C.M.R. 233 (1960). It follows that evidence of the presence of these remaining items in the storage room as alleged misconduct could not even have tended to identify the accused and should have been excluded entirely.[11]

The final assignment of error we discuss concerns the military judge's instruction on knowledge pertaining to the charge of failure to obey a lawful general regulation, specifically paragraph 8–100e, Air Force Regulation 205–1, Information Security Program dated 21 Jan. 1976. This paragraph provides:

8–100e (Added) Removal of Classified Material. No one is authorized to remove classified material from the installation or organization having responsibility for its custody without specific permission from the commander concerned or his designated representative.

■ Trial defense counsel requested an instruction on findings which would have required the court to find that the accused knew, at the time of removing the material from the base, that it was classified. The military judge refused this instruction. After closing the court for findings, the court

was reopened and a question was posed by the court president. He stated:

We would like to know if you can instruct us with regard to Charge II, and the Specification, our specific question is if an individual does not know he is in possession of classified material, is he in violation of Air Force Regulation 205–1, paragraph 8–100e, if he removed a bag containing this material from a military reservation?

The military judge later instructed the court as follows:

Mr. President, the answer to your question is as follows. With regard to the Specification of Charge II, if you find beyond a reasonable doubt that the accused removed registered mail from Rhein-Main Air Base as alleged, and if you find beyond a reasonable doubt that he knew, or should have known, it contained classified material, he may be found guilty of the specification of Charge II without proving he had actual knowledge that he possessed classified material, if you are convinced beyond a reasonable doubt that the other elements have been proven beyond a reasonable doubt.

Appellate defense counsel contend this instruction presented the court with an erroneous standard regarding knowledge and permitted the court to base a guilty finding upon a finding of mere negligence on the part of the accused. We agree the instruction was erroneous.

In considering the intent of the regulation and the wording of the particular paragraph alleged to have been violated, it is our opinion that criminal sanction for a violation would require an act done willfully and with knowledge of the presence of classified material. *United States v. Bowden,* 24 C.M.R. 540 (A.F.B.R.1957). This requirement is not unlike that which pertains to possession and use of marijuana wherein lack of knowledge of the presence

11. In the absence of a conviction for any of these alleged offenses, impeachment of the accused thereon was improper. Manual for Courts-Martial, 1969 (Rev.) paragraph

153b(2)(b). Likewise, under the facts of this case, it was not rebuttal of evidence offered by the defense.

of the substance is raised by the evidence. See *United States v. Hughes,* 5 U.S.C.M.A. 374, 17 C.M.R. 374 (1954); *United States v. Reese,* 5 U.S.C.M.A. 560, 18 C.M.R. 184 (1955); and *United States v. Greenwood,* 6 U.S.C.M.A. 209, 19 C.M.R. 335 (1955). Administrative sanctions within the provisions of the regulation presently require no less than such knowledge.[12]

For the reasons stated, the findings and sentence are set aside. A rehearing may be ordered.

EARLY, Chief Judge, and ARROWOOD, Judge, concur.

### ORDER

PER CURIAM:

The Motion for reconsideration submitted by Appellate Government Counsel on 16 January 1980 is denied.

EARLY, Chief Judge (dubitante):

Appellate Government counsel have asked this Court to reconsider our decision setting aside the findings of guilty and the sentence because of an alleged illegal search and seizure of evidence found in a German apartment. *United States v. Whiting,* 9 M.J. 501 (C.M.R.1980). My brothers have denied the motion. Although I concurred in the original disposition as being an accurate reflection of the law as set forth in *United States v. Reagan,* 7 M.J. 490 (C.M.A.1979), I must record my doubts as to the correctness of the latter decision.

In *Reagan, supra,* a military commander authorized the search of a military person's apartment located in the Federal Republic of Germany pursuant to the Supplementary Agreement to the North Atlantic Treaty Organization Status of Forces Agreement with Respect to Forces Stationed in the Federal Republic of Germany, 1 U.S.T. 531, and Army Regulation 190–22, and the USAREUR Supplement 1 thereto. The former provides in pertinent part:

> The military police of a force shall have the right to patrol on public roads, on public transport, in restaurants . . . and in all other places to which the public has access and to take such measures with respect to the members of a force, of a civilian component or dependents as are necessary to maintain order and discipline. Insofar as it is necessary or expedient the details of the exercise of the right shall be agreed upon between the German authorities and the authorities of the force, who shall maintain close mutual liaison.

Art. 28, Supplemental Agreement, *supra,* 1 U.S.T. at 559–60.

The aforementioned Army Regulation provides:

> When a person or property is located in a foreign country, the Commander will authorize a search only when such action is authorized by an international agreement or arrangement with the authorities of the foreign country.

AR 190–22, para. 2–1.

On this authority the Court of Military Appeals held that neither the Agreement, the Army Regulation nor the Manual for Courts-Martial, 1969 (Rev.), paragraph 152, permitted the search without prior coordination with the German authorities. The Court said:

> It is basic to the law, requiring neither cited authority nor extensive comment, that one of the parties to an international treaty cannot enlarge the terms of the original treaty.

> The obligation to show that this search is within the purview of the treaty is upon the Government, but such has not been established on the record.

*United States v. Reagan,* 7 M.J. at 491.

Appellate Government counsel challenge the authority of this holding as applied to the instant case, citing *United States v.*

---

12. Air Force Regulation, 205–1, Information Security Program Regulation, paragraph 14–101c, dated December 1978.

*Carter,* 16 U.S.C.M.A. 277, 36 C.M.R. 422 (1966).[1]

In *Carter, supra,* the facts were similar to those here. Three opinions were issued. In the lead opinion, Judge Kilday opined:

[C]ounsel for the Government believe that all Status of Forces Agreement obligations were met; that the Agreement and paragraph 152, Manual for Courts-Martial, 1951, are not incompatible; but that the purported violation of the NATO Status of Forces Agreement is totally irrelevant to the rights of an accused at a trial by court-martial.

It is with the Government's position that we must agree, for the Court is unanimous in its belief that the only pertinent question present, under the facts of this case, is whether or not the authority to search was granted upon probable cause.

\*   \*   \*   \*   \*   \*

The Status of Forces Agreement confers no *individual* right and most assuredly seeks only to preserve those protections presently existing.

36 C.M.R. at 437.

Concurring, Chief Judge Quinn stated, in passing:

In my opinion, therefore, the accused can rely upon the Status of Forces Agreement to challenge the legality of the search of his home.

36 C.M.R. at 445.

Judge Ferguson, concurring and dissenting, held:

I agree with Judge Kilday's scholarly discussion of the issue regarding search and seizure and the determination that no illegality is to be found here. A search conducted by American officers for the recovery of the fruits of crime, based on probable cause and authority by a proper person, is to be governed by American law when its product is tendered in evidence at a United States court-martial. It is to the United States Constitution

that we must look in measuring the exercise of Federal power, and by its standards we must be guided in the receipt of evidence on behalf of the prosecution. Here, the search satisfied those requirements and, under the facts presented, we need look no further.

36 C.M.R. 445.

The pertinent parcel of authority (and that which was utilized by the commander in the instant case) is the Manual for Courts-Martial, 1969 (Rev.), paragraph 152:

The following searches are among those which are lawful:

\*   \*   \*   \*   \*   \*

A search of any of the following three kinds which has been authorized upon probable cause by a commanding officer . . . having control over the place where the property or person searched is situated or found or, if that place is not under military control, having control over persons subject to military law or the law of war in that place:

(1) A search of property owned, used, or occupied by, or in the possession of, a person subject to military law or the law of war, the property being situated in a . . . foreign country.

Turning to the case at hand, it appears to me that the Agreement in question does not, create any requirement, as such, that foreign authorities authorize the search. We are being asked to enforce a presumed right—not granted in the Agreement—simply because the Agreement does not *deny* the existence of the right. No United States court has done so, and we have no way of knowing whether the German courts would so construe the Agreement. Thus, the failure to obtain German authorization of the search is solely a matter of concern for German authorities; an issue which must be pursued by German authorities through diplomatic channels.

---

1. Appellate Government Counsel argue that the *Reagan* case stands only for the proposition that the Army failed to follow its own regulations. There is no similar Air Force regulation in issue here. Hence, only the cited paragraph of the Manual for Courts-Martial gives authority for the search here.

Even assuming that the general language of the Agreement created the obligation to obtain German authorization, by liaison or otherwise, it would not create a right for the accused to challenge a search otherwise proper under existing United States law. "Standing" to contest alleged treaty violations may not be assumed; rather the treaty or agreement must clearly indicate an intention to create present enforceable rights for individuals. In *Foster and Elam v. Neilson*, 27 U.S. (2 Pet.) 253, 314, 7 L.Ed. 415 (1829), Chief Justice Marshall gave the test to be applied by United States courts:

> A treaty is in its nature a contract between two nations not a Legislative Act. It does not generally effect, of itself, the object to be accomplished, especially so far as its operation is intraterritorial, but is carried into execution by the sovereign power of the respective parties to the instrument.
>
> In the United States a different principle is established. Our Constitution declares a treaty to be the law of the land. It is, consequently, to be regarded in the courts of justice as equivalent to an Act of the Legislature, whenever it operates of itself without the aid of any legislative provision. But when the terms of the stipulation import a contract—when either of the parties engages to perform a particular act—the treaty addresses itself to the political not the judicial department; and the Legislature must execute the contract before it can become a rule for the court.

Thus, otherwise stated, while a United States treaty, which has received the consent of the Senate, is a part of the law of the land, it is only when the treaty is self-executing that it may be the basis for the assertion of rights by individuals.[2] *Dreyfus v. Von Finck*, 534 F.2d 24 (2d Cir. 1976), *cert. denied*, 429 U.S. 835, 97 S.Ct. 102, 50 L.Ed.2d 101 (1976). On the other hand, unless the treaty is self-executing, the individual has no enforceable rights thereunder

or standing to contest a violation since he is not a party to the treaty. See *Whitney v. Robertson*, 124 U.S. 190, 8 S.Ct. 456, 31 L.Ed. 386 (1888); *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886); *Edye v. Robertson*, 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798 (1884); *People of Saipan v. United States*, 502 F.2d 90 (9th Cir. 1974), *cert. denied*, 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975); *Robertson v. General Electric Co.*, 32 F.2d 495 (4th Cir. 1929), *cert. denied*, 289 U.S. 571, 50 S.Ct. 28, 74 L.Ed. 624 (1929); *Canadian Transport v. United States*, 430 F.Supp. 1168 (D.D.C. 1977); Annot., 42 A.L.R. (Fed.) 577 (1979); *United States v. Bowie*, 34 C.M.R. 808 (A.F. B.R.1964), *affirmed*, 4 U.S.C.M.A. 631, 34 C.M.R. 411 (1964).

In sum, I believe that *Reagan*, if read literally, enunciates an incorrect and unwise principle of law.

be given or protected by United States courts. See *Holmes v. Laird*, 459 F.2d 1211 (D.C.Cir. 1972), *cert. denied*, 409 U.S. 869, 93 S.Ct. 197, 34 L.Ed.2d 120 (1972); Annot., 17 A.L.R.2d 725 (1973).

---

**2.** A matter of further concern is that the practical effect of *Reagan* might be to increase the likelihood that an accused might be tried instead by the foreign court where the guarantees of right afforded in a court-martial will not