UNITED STATES, Appellant,

v.

Kurt L. WHITING, Sergeant U. S. Air
Force, Appellee.

No. 38,885.
ACM 22521.

U. S. Court of Military Appeals.

Jan. 18, 1982.

For Appellee: *Colonel Larry G. Stephens*
and *Major Robert G. Gibson, Jr.* (on brief);
*Colonel George R. Stevens.*

For Appellant: *Colonel James P. Porter*
and *Major Robert T. Mounts* (on brief).

Opinion of the Court

EVERETT, Chief Judge:

Contrary to appellant's pleas, a general
court-martial convened at Rhein-Main Air
Base, Federal Republic of Germany, in Feb-
ruary, 1979, found him guilty of stealing
mail matter, having unauthorized posses-
sion of classified documents, and failing to
obey a regulation which prohibited taking
classified documents off-base,[1] in violation
of Articles 134 and 92, Uniform Code of
Military Justice, 10 U.S.C. §§ 934 and 892,
respectively. The convening authority ap-
proved the findings and the adjudged sen-
tence of dishonorable discharge, total for-
feitures, confinement at hard labor for 1
year, and reduction to airman basic. How-
ever, the United States Air Force Court of
Military Review concluded that the military
judge admitted evidence obtained by an
unlawful search of appellant's off-base
apartment in Grafenhausen and that the
findings and sentence should be set aside.
9 M.J. 501 (1980). After a motion for re-
consideration submitted by appellate
government counsel was denied, the Judge
Advocate General of the Air Force sub-
mitted to us this certified issue (9 M.J. 26):

WAS THE COURT OF MILITARY RE-
VIEW CORRECT IN HOLDING THAT
THE SEARCH OF THE ACCUSED'S
OFF-BASE APARTMENT WAS ILLE-
GAL?

I

On May 19, 1978, agents of the Air Force
Office of Special Investigations (OSI)
learned from an Air Force master sergeant
that his wife, a German national, had dis-

---

1. He was acquitted on a charge of wrongfully
possessing marihuana, in violation of Article

134, Uniform Code of Military Justice, 10
U.S.C. § 934.

covered in a storage room of her parents' home some plastic bags containing items which appeared to be United States mail matter and classified documents. This storage room was near to, but separated from, the off-base apartment of appellant, who was stationed at Rhein-Main Air Base; he shared its use with his landlord.

The OSI agents conducted a search of the storage room with the consent of the landlord and confirmed the report they had received. After being briefed by the agents, Colonel Berg, the Rhein-Main Base Commander, authorized a search of appellant's apartment, where they seized two United States mail bags and a jewelry box containing a ring embossed "United States Navy."

At trial, defense counsel objected to admission of this evidence on these four grounds: (1) that the commander who authorized the search was not a neutral and detached magistrate; (2) that the commander of the Rhein-Main Air Base was not among the commanders who could authorize the search of appellant's off-base apartment; (3) that probable cause was lacking to support the search authorization; and (4) that German authorities had not been notified of the off-base search, as was required by international agreements to which the United States and Germany were parties. The Court of Military Review agreed with the fourth basis of the objection and confined its discussion thereto. Although the certified issue is phrased in broad terms, we construe it to be limited to the issue addressed by the court below.

II

The Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces, 4 U.S.T. 1792, T.I.A.S. No. 2846 (effective date—August 23, 1953), often referred to as the NATO SOFA, has been the model for agreements by the United States with various countries in which American forces have been sta-

tioned. In Article VII of that Agreement, as part of the provisions concerning criminal jurisdiction, various procedural safeguards are set forth. Undoubtedly the American negotiators of NATO SOFA were primarily concerned with assuring that American servicemembers tried by the host countries were granted protections which, at least from the American viewpoint, seemed basic. *See generally* Lazareff, *Status of Military Forces Under Current International Law* 208–33 (1971); Snee and Pye, *Status of Forces Agreement—Criminal Jurisdiction* (1957). One commentator has even termed these safeguards a "Precursor to an International Bill of Procedural Rights." *See* Ellert, *NATO "Fair Trial" Safeguards: Precursor to an International Bill of Procedural Rights* (1963). This same commentator observed:

An examination of paragraph 9 of Article VII of the NATO SOFA discloses that the language delimiting these safeguards is personal in nature. It contains such words and phrases as "he shall be entitled," "made against him," "witnesses in his favor," "legal representation of his own choice for his defense," "if he considers it necessary," and "present at his trial." This language clearly demonstrates that the signatories of the Agreement have coupled these safeguards to the individual and to this extent the serviceman in the hypothetical case has acquired under international law a personal right to these safeguards. In corroboration of this view, the United States in practice has taken the position that an accused United States serviceman may waive any of the safeguards set out in paragraph 9 of Article VII, *supra*, by refusing to appeal his case to a higher tribunal of the receiving state. In such instances the United States has not protested the denial of a safeguard provided by paragraph 9 of Article VII, *supra*, by the lower tribunal of the receiving state.

*Id.* at 46 (footnotes omitted).[2] Moreover, he concluded:

**2.** Ellert notes these other instances where states have by international agreement accorded individuals a limited in-

ternational personality ...: (1) The Central American Court of Justice which was created by the Treaty of Washington of December 20,

By virtue of the NATO SOFA the United States has joined with the other signatories in granting the serviceman a personal right under international law. Further, under United States domestic law the United States would be bound to accord the rights set forth in paragraph 9 of Article VII, *supra,* to a foreign serviceman tried in a United States Court. *Id.* at 52. Similarly, our Court has recently decided that the double-jeopardy guarantees contained in a bilateral treaty with Spain—guarantees similar to those in Article VII of the NATO SOFA—were binding on the United States in the trial by court-martial of an American servicemember. *United States v. Stokes,* 12 M.J. 229 (C.M.A.1982).

Although Article VII of the NATO SOFA adverts to investigations and seizures, we find nothing therein which purports to confer upon individuals any specific rights with respect to searches and seizures. Instead the obligations are placed on the contracting parties to assist one another in certain law enforcement activities, and the performance of those obligations is exclusively within the province of the Executive and Legislative Branches. *Cf. Wilson v. Girard,* 354 U.S. 524, 77 S.Ct. 1409, 1 L.Ed.2d 1544 (1957); Article VII, paragraph 6 of NATO SOFA. Moreover, our attention has not been directed to any provision of any supplementary agreement with the Federal Republic of Germany which purports to grant rights to any individual to object to the admission of evidence because it was obtained by unreasonable search and seizure.

Few judicial systems exclude evidence because it was obtained by unreasonable search and seizure. Even the United Kingdom, from which many of our own legal institutions are derived, continues to reject the exclusionary rule. *See, e. g., Report of Royal Commission on Criminal Procedure* (1981). Indeed, at the time when the NATO SOFA was negotiated, the exclusionary rule was not applied in a majority of American states. *See Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), overruled by *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Therefore, we conclude that the NATO SOFA and the various international agreements derived therefrom were not intended to confer upon individuals—whether American service members tried in foreign countries or foreign military personnel prosecuted in American civil courts—any rights concerning searches and seizures that they would not otherwise possess under domestic law. *Cf. United States v. Carter,* 16 U.S.C. M.A. 277, 283, 36 C.M.R. 433, 439 (1966). Although treaties are the supreme law of the land, U.S.Const. art. VI, this is not to say that individuals always may enforce this country's treaty rights by a private law

1907, and before which individuals of one of the five signatories were permitted to assert claims directly against one of the other four signatories according to Article 2, paragraphs b and c of the Treaty; (2) The German-Polish Upper Silesia Convention of May 15, 1922, under which individuals were granted the capacity directly to claim their vested rights before an international tribunal not only against a foreign government but also against their own government; (3) The Convention on the Political Rights of Women of December 20, 1952, which creates or guarantees important substantive rights for individuals, but does not provide for a capacity for international legal action of these individuals in order to protect by themselves their rights under international law; (4) private individuals and corporations have the right to legal action before the Court of Justice of the European Coal and Steel Community which was constituted in December 1952 by six states on the basis of an international agreement; and (5) The European Convention for the Protection of Human Rights and Fundamental Freedoms of November 4, 1950, which guarantees individuals certain substantive human rights and which by Article 25 provides individuals certain limited access to the European Commission of Human Rights.
Ellert, *NATO "Fair Trial" Safeguards: Precursor to an International Bill of Procedural Rights,* 45–46 n.3 (1963). Another writer, while agreeing with Ellert, suggests: "It could be well to make it clear that paragraph 9 of Article VII confers rights on the accused and not on the State to which he belongs." Lazareff, *Status of Military Forces Under Current International Law* 265 (1971).

action or by invoking an exclusionary rule. *United States v. Carter, supra.*[3]

## II

The certified question is answered in the negative and the decision of the United States Air Force Court of Military Review is reversed. The record of trial is returned to the Judge Advocate General of the Air Force for submission to that court for such further proceedings as may be necessary in light of this opinion.

COOK, Judge (concurring):

The Court of Military Review upheld accused's contention "that paragraphs 6(a) and 10(b) of Article VII of the [North Atlantic Treaty Organization Status of Forces Agreement] NATO SOFA required ... liaison with German authorities" before effec-

tuation of an authorized off-base search of a servicemember's apartment. 9 M.J. 501, 503 (1980). Paragraph 6.–(a) of Article VII of the NATO SOFA and Article 3 of the Supplementary Agreement to the NATO SOFA,[1] impose an obligation upon the parties to "render mutual assistance" in the investigation and collection of evidence. The regulated conduct is that between the countries. No private right of, or protection to, an individual is comprehended within the requirement. Consequently, I perceive no possible basis for invocation of an exclusionary rule which is predicated upon violation of a private right. *See* my opinion in *United States v. Bunkley,* 12 M.J. 240 (C.M.A.1982).

Similarly, NATO SOFA Article VII, paragraph 10.–(b) and pertinent subdivisions of Article 3 of the Supplementary

---

**3.** Like treaties, properly promulgated regulations may have the force of law. *Paul v. United States,* 371 U.S. 245, 255, 83 S.Ct. 426, 433, 9 L.Ed.2d 292 (1963) (Armed Services Procurement Regulation requiring competition preempted anticompetitive California milk control legislation); *Public Utilities Commission v. United States,* 355 U.S. 534, 542–43, 78 S.Ct. 446, 452–53, 2 L.Ed.2d 470 (1958) (military regulations concerning procurement of transportation preempted regulatory authority of California Public Utilities Commission over intrastate military traffic); *Leslie Miller Inc. v. Arkansas,* 352 U.S. 187, 77 S.Ct. 257, 1 L.Ed.2d 231 (1956) (for purposes of military construction in Arkansas the definition of "responsible bidder" in the Armed Services Procurement Regulations preempts state licensing law); *Standard Oil Co. v. Johnson,* 316 U.S. 481, 62 S.Ct. 1168, 86 L.Ed. 1611 (1942) (War Department regulations providing for post exchanges have the force of law). Furthermore, the Government may be bound by its own regulations. *Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959). However—as with treaties—not every regulation creates a duty enforcible by court proceedings against an individual, *cf. United States v. Nardell,* 21 U.S.C.M.A. 327, 45 C.M.R. 101 (1972); sometimes the violation of a regulation does not give rise to immunity from prosecution or application of the exclusionary rule in that prosecution. *United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979). *See Schweiker v. Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981). *United States v. Cormier,* 639 F.2d 1177 (5th Cir. 1981); *United States v. Sandate,* 630 F.2d 326 (5th Cir. 1980), *cert. denied,* 450 U.S. 922, 101 S.Ct. 1372, 67 L.Ed.2d 351 (1981); *United*

*States v. Renfro,* 620 F.2d 569 (6th Cir. 1980), *cert. denied,* 449 U.S. 902, 101 S.Ct. 274, 66 L.Ed. (1980); *United States v. Meier,* 607 F.2d 215 (8th Cir. 1979), *cert. denied,* 445 U.S. 966, 100 S.Ct. 1658, 64 L.Ed.2d 243 (1980).

**1.** Article VII, paragraph 6.–(a) of the Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces [NATO SOFA], 4 U.S.T. 1792, T.I.A.S. No. 2846 (effective date—August 23, 1953), and Article 3 of the Agreement to supplement the Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces with respect to Foreign Forces stationed in the Federal Republic of Germany [Supplementary Agreement], 14 U.S.T. 531, T.I.A.S. No. 5351 (effective date—July 1, 1963), respectively, state:

| NATO SOFA | Supplementary Agreement |
|---|---|
| Article VII | Article 3 |
| 6.–(a) The authorities of the receiving and sending States shall assist each other in the carrying out of all necessary investigations into offenses, and in the collection and production of evidence, including the seizure ... of objects connected with an offense. | 1. In accordance with the obligations imposed by the North Atlantic Treaty upon the contracting parties thereto to render mutual assistance, the German authorities and the authorities of the forces shall cooperate closely to ensure the implementation of ... [SOFA] and of the present Agreement. |
| [4 U.S.T. at 1800.] | [14 U.S.T. at 539 (footnote omitted).] |

Agreement,[2] cannot reasonably be construed to establish additional safeguards to a servicemember's right to be free from unreasonable search and seizure by American military law enforcement authorities. In *United States v. Bunkley, supra,* I set out my reasons for concluding that paragraph 10.–(b), and related Article 28 of the Supplementary Agreement do "not establish civilian premises occupied by a servicemember as a privileged sanctuary against entry by an American military law enforcement agent." 12 M.J. 249. I discern no encroachment on an individual's expectation of privacy by the failure of military authorities to effect liaison with authorities of the host nation before execution of a valid military authorization to search. The absence of coordination with enforcement agents of the host country has no evident impact upon the individual's privacy or the requirement of probable cause for an American search. That it is not reason to subject the results of an otherwise lawful search to an exclusionary rule is manifested by Mil.R. Evid. 315(c)(4)(B), which provides that, where "a treaty or agreement" requires "concurrence" from "an appropriate representative of the foreign country," such concurrence should be obtained, but "noncompliance with a treaty or agreement ... does not render a search unlawful."

I join in answering the certified question in the negative, setting aside the decision of the United States Air Force Court of Military Review, and in directing return of the record of trial to that court for further review.

FLETCHER, Judge (dissenting):

I must dissent.

Paragraph 152, Manual for Courts-Martial, United States, 1969 (Revised edition), provides that evidence "obtained as a result of an unlawful search of" an accused's "property ... by an ... agent of the United States" is inadmissible against him at a court-martial. This Manual provision also authorizes a commanding officer with probable cause to lawfully search the property of a servicemember in a foreign country, although it may be located in an area not under military control. In my opinion, this Court is required to construe these portions of the Manual for Courts-Martial in conformity with accepted principles of international law.[1] *F.T.C. v. Compagnie De Saint-Gobain-Pont-A-Mousson,* 636 F.2d 1300, 1327 (D.C.Cir.1980). The Government in this case has not shown that the search of appellant's home in Germany by military police agents was in accordance with the NATO SOFA[2] and the Supplementary

---

**2.** Article VII, paragraph 10, NATO SOFA, and pertinent subdivisions of Article 3 of the Supplementary Agreement, state:

| NATO SOFA | Supplementary Agreement to NATO SOFA |
|---|---|
| **Article VII** | **Article 28** |
| 10.–(a) Regularly constituted military units ... shall have the right to police any camps, establishments or other premises which they occupy as the result of an agreement with the receiving State. The military police of the force may take all appropriate measures to ensure the maintenance of order and security on such premises. | 1. The military police of a force shall have the right to patrol on public roads, on public transport, in restaurants (Gaststätten) and in all other places to which the public has access and to take such measures with respect to the members of a force, ... as are necessary to maintain order and discipline. Insofar as it is necessary or expedient the details of the exercise of this right shall be agreed upon between the German authori- |
| (b) Outside these premises, such military police shall be employed only | ties and the authorities of the force, who shall maintain close mutual liaison. [*Id.* at 559–60.] |
| subject to arrangements with the authorities of the receiving State and in liaison with those authorities, and in so far as such employment is necessary to maintain discipline and order among the members of the force. [*Id.* at 1802.] | |

**1.** It is unreasonable to assume that the President as Commander in Chief would promulgate provisions in the Manual for Courts-Martial which would undermine treaty commitments to foreign countries made by him as our chief foreign policy maker. *See* Tribe, *Constitutional Law* 168–69 (1978).

**2.** Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their

Agreement with Germany.[3] Accordingly, as a matter of international law accepted by the United States, this search was unlawful. Consequently, in accordance with the Manual, its fruits must be suppressed. *United States v. Reagan*, 7 M.J. 490 (C.M.A. 1979); *United States v. Mitchell*, 21 U.S.C. M.A. 340, 45 C.M.R. 114 (1972); *United States v. Carter*, 16 U.S.C.M.A. 277, 36 C.M.R. 433 (1966).

More particularly, in *Wilson v. Girard*, 354 U.S. 524, 529, 77 S.Ct. 1409, 1411, 1 L.Ed.2d 1544 (1957), the Supreme Court stated:

> A sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within its borders, unless it expressly or impliedly consents to surrender its jurisdiction.

Such a statement by the Supreme Court constitutes, at the very least, recognition of the principle of international law denominated the right of territorial sovereignty. *See generally* Lazareff, *Status of Military Forces Under Current International Law* 1–18 (1971); *see also F.T.C. v. Compagnie*

*De Saint-Gobain-Pont-A-Mousson, supra.* This principle of international law embraces the collateral principle that a state sending troops peacefully within the territorial boundaries of another sovereign has no legal right to police violations of its own laws in the foreign country by these soldiers without the consent of the territorial sovereign. *See* Lazareff, *supra* at 254. The NATO SOFA and the Supplementary Agreement constitute legal recognition by the President of the United States of the territorial sovereignty of the Federal Republic of Germany. *See* Lazareff, *supra* at 70–76, 430–33. Article 28, Supplementary Agreement to the NATO SOFA, expressly provides that American military police have the direct right to patrol and take appropriate measures to insure "order and discipline" among servicemembers and civilian dependents in public places in Germany.[4] No mention is made of any direct right of the American military to conduct law enforcement activities in non-public places, such as the off-base residence of an American servicemember. No such direct right to

---

Forces, 4 U.S.T. 1972, 1800, 1802; T.I.A.S. No. 2846 (effective date August 23, 1953).

### ARTICLE VII

6.–(a) The authorities of the receiving and sending States shall assist each other in the carrying out of all necessary investigations into offences, and in the collection and production of evidence, including the seizure and, in proper cases, the handing over of objects connected with an offence. The handing over of such objects may, however, be made subject to their return within the time specified by the authority delivering them.

\* \* \* \* \* \*

10.–(a) Regularly constituted military units or formations of a force shall have the right to police any camps, establishments or other premises which they occupy as the result of an agreement with the receiving State. The military police of the force may take all appropriate measures to ensure the maintenance of order and security on such premises.

(b) Outside these premises, such military police shall be employed only subject to arrangements with the authorities of the receiving State and in liaison with those authorities, and in so far as such employment is necessary to maintain discipline and order among the members of the force.

3. Agreement to Supplement the Agreement between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces with respect to Foreign Forces stationed in the Federal Republic of Germany, 14 U.S.T. 531, 559–60; T.I.A.S. No. 5351 (effective date July 1, 1963).

### Article 28

1. The military police of a force shall have the right to patrol on public roads, on public transport, in restaurants (Gaststätten) and in all other places to which the public has access and to take such measures with respect to the members of a force, of a civilian component or dependents as are necessary to maintain order and discipline. Insofar as it is necessary or expedient the details of the exercise of this right shall be agreed upon between the German authorities and the authorities of the force, who shall maintain close mutual liaison.

2. If public order and safety are endangered or disturbed by an incident in which members of a force or of a civilian component or dependents are involved, the military police of a force shall, if so requested by the German authorities, take appropriate measures with respect to such persons to maintain or restore order and discipline.

4. *See* n. 3, *supra.*

police in these areas can be implied where the agreement itself specifically delineates the areas where American military police may act without securing the consent of local authorities.[5] In view of the foregoing principle of territorial sovereignty and NATO SOFA Article VII, paragraphs 6.–(a) and 10.–(b), the American military police agents had no legal authority or otherwise to search appellant's off-base residence without the consent of the local foreign authorities. *See* Lazareff, *supra* at 235–37, 255–56. Such action by these government agents in the present case was unlawful.[6] *See Irvine v. California*, 347 U.S. 128, 132, 74 S.Ct. 381, 382, 98 L.Ed. 561 (1954).

My Brother judges eschew the traditional approach to this question. Instead, they assert that the NATO SOFA and the Supplementary Agreement with Germany do not intend to confer nor do they confer any additional rights concerning search and seizure on the American servicemember which he would not otherwise possess as a matter of domestic law. *Cf. United States v. Stokes*, 12 M.J. 229 n. 3 (C.M.A.1982). Moreover, they assert that these agreements grant no rights to an individual to object to the admission of evidence because is was obtained by unreasonable search and seizure. *Cf.* Lazareff, *supra* at 225–28. Accordingly, they hold that a servicemember may not enforce the treaty provisions by invoking the exclusionary rule at a court-martial. *See United States v. Caceres*, 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979).

The obvious shortcoming in the majority's approach to this question is that it fails to recognize or ignores the requirements of the fourth amendment in this context. It is well established that the Constitution in-cluding the Bill of Rights applies abroad whenever an agent of our government acts against a citizen of the United States to deprive him of his life, liberty or property. *Reid v. Covert*, 354 U.S. 1, 5–14, 77 S.Ct. 1222, 1224–1229, 1 L.Ed.2d 1148 (1957) (plurality opinion). Accordingly, the absence of a specific right in an international agreement to be free from an unreasonable search and seizure or for the individual to object to the admission of its fruits in a criminal proceeding of a foreign state does not abrogate his right under the fourth amendment to object in an American court-martial to unreasonable search and seizure by our government. *See generally* Tribe, *American Constitutional Law* 170 (1978).

A second shortcoming in the majority's approach to this question is its misperception of the basis of appellant's claim in this case. He is not seeking to enforce the sovereign rights of the Federal Republic of Germany under these treaty agreements by application of the exclusionary rule at his court-martial.[7] What he is doing is challenging the authority of agents of the United States to act upon his private property in the Federal Republic of Germany without consent of that sovereign. *See F.T.C. v. Compagnie De Saint-Gobain-Pont-A-Mousson, supra.* His claim, though sounding in international law and jurisdictional in nature, questions the reasonableness of such government action in light of the fourth amendment. In other words, does the Constitution or federal law (*Leslie Miller, Inc. v. United States*, 357 U.S. 301, 77 S.Ct. 257, 1 L.Ed.2d 231 (1958)) protect the privacy of individuals in appellant's position from such unauthorized police action by agents of the United States? *See* 2 W. LaFave, *Search and Seizure* § 4.2(f) (1978).

---

5. *See United States v. Bunkley*, 12 M.J. 240 (C.M.A.1982) (Fletcher, J., concurring in the result).

6. The majority opinion today indirectly encourages, if not condones, action by American military police which is in violation of federal law. *See Foster v. Neilson*, 27 U.S. (2 Peters) 253, 314, 7 L.Ed. 415 (1829). Such unlawful police conduct, as indicated above, also infringes on the rights of territorial sovereignty of the Fed-eral Republic of Germany. *See* Lazareff, *Status of Military Forces Under Current International Law* 254 (1971). Finally, such military police action is an express violation of the President's directions in the sensitive area of foreign affairs. *See* Tribe, *supra* at 163–72.

7. Of course, a ruling in appellant's favor on this question would avoid many of the deleterious effects of the majority opinion. *See* n. 6, *supra*.

In *United States v. Caceres, supra,* the Supreme Court addressed the same question under materially different circumstances. There, it held that neither the Constitution nor federal statutory law required that an Internal Revenue Agent secure the administrative approval of his superiors, as required by agency regulations, before he secretly tape recorded his conversations with a taxpayer. Such a holding presumes that this government agent was executing a lawful power of the sovereign government in interviewing the taxpayer. *See Burdeau v. McDowell,* 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). In the case before us, as indicated earlier, the sovereign government of the United States has no power, reasonably exercised or not, to search and seize property of an American citizen located in a foreign country unless it is done in conformity with its agreement with that foreign country.[8] Accordingly, the rationale articulated in *United States v. Caceres, supra,* is not relevant to the case before us.

The question which remains to be answered is whether the government agents violated appellant's rights under the fourth amendment or federal law when they searched the off-base residence of appellant in Germany. It is well established that a servicemember has a legitimately greater expectation of privacy in his off-base dwelling in the United States than in his on-base dwelling within the territorial limits of our country. *See generally Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979). This is true because, with certain exceptions not applicable in the present case, the former may not be lawfully searched without a warrant based on probable cause issued by a neutral and detached magistrate. *See United States v. Mitchell, supra* at 342, 45 C.M.R. at 116. The on-base dwelling of a servicemember, however, may be constitutionally searched upon authorization of his commanding officer acting also on the basis of probable cause. *See United States v. Ezell,* 6 M.J.

307, 317–18 (C.M.A.1979). The added protection offered by the warrant as compared to command authorization is significant but the different standard can be justified constitutionally within the context of the military community. *Id.*

With this difference in mind, I must next recognize the fact that many servicemembers assigned overseas are permitted and do maintain off-base dwellings in foreign countries. Appellant is one of these servicemen. In addition, it must be recognized that there are no American civilian courts in this country or overseas which are available or empowered to issue warrants for searches and seizures in these off-post dwellings. *See United States v. DeLeo,* 5 U.S.C.M.A. 148, 157, 17 C.M.R. 148, 157 (1954). The question, which the majority ignores, is what becomes of this greater expectation of privacy that a servicemember legitimately has in his off-post dwelling when it is situated in a foreign country? *See generally* Cooley, *Constitutional Limitations* 229–307 (1874).

In such a situation where a warrant cannot be secured, the servicemember, as is his civilian counterpart, is entitled to reasonable government action as dictated by the facts and circumstances of the case. *See Richardson v. Zuppann,* 81 F.Supp. 809, 813 (M.D.Pa.1949), *aff'd,* 174 F.2d 829 (3d Cir. 1949), citing *Go-Bart Importing Co. v. United States,* 282 U.S. 344, 357, 51 S.Ct. 153, 158, 75 L.Ed. 374 (1931); *see also United States v. DeLeo, supra.* One of the circumstances surrounding this exercise of government power to be considered is the nature of the presence of American servicemembers within the foreign country. *See Best v. United States,* 184 F.2d 131, 140–41 (1st Cir. 1950); *Grewe v. France,* 75 F.Supp. 433, 437 (E.D.Wisc.1948). Another circumstance is the existence of orderly procedures by which such a search might be ordered and customarily carried out by American mili-

---

**8.** I need not address the question whether such power exists during time of war or absent any agreement with the foreign state, for those facts are not before us. *See Lazareff, supra* at 11–18; Cooley, *Constitutional Limitations* 1–11 (1874).

tary police in a foreign country.[9]  *See Richardson v. Zuppann, supra.*  Here, the presence of American servicemembers in the Federal Republic of Germany was for mutual defense purposes during a time of peace.  Moreover, the President, by signing the treaty and promulgating the Manual for Courts-Martial, established orderly procedures for the search and seizure of a servicemember's property in this context in a foreign country.  The military police in

this case did not comply with these orderly procedures prior to searching appellant's off-base apartment.  No explanation or justification was offered for their conduct nor was evidence offered that it was customarily agreed, in accordance with the treaty, not to seek permission of German authorities in these matters.  In my opinion, these government agents acted unreasonably and in violation of appellant's fourth amendment rights.

**9.** Paragraph 152, Manual for Courts-Martial, United States, 1969 (Revised edition)—the Manual provision which purportedly authorized the government agents to search appellant's off-post dwelling in this case—is a clarification of paragraph 152, Manual for Courts-Martial, United States, 1951.  *See* Analysis of Contents, Manual for Courts-Martial, United States, 1969 (Revised edition), para. 152.  The latter provision concerning military searches was based on paragraph 138, Manual for Courts-Martial, U.S. Army, 1949, and its acceptance by federal courts in *Grewe v. France,* 75 F.Supp. 433 (E.D. Wisc.1948), and *Best v. United States,* 184 F.2d 131 (1st Cir. 1950).  *See Legal and Legislative Basis,* Manual for Courts-Martial, United States, 1951, para. 152.  The NATO SOFA, as indicated in footnote 2, was effective as to the United States in 1953 and the Supplementary Agreement, as indicated in footnote 3, was effective as to the United States in 1963.  Accordingly, these agreements were not in effect when the federal courts decided this issue.