UNITED STATES, Appellee,

v.

**Elza L. GREEN, Jr., Airman First Class, U.S. Air Force, Appellant.**

No. 41362.
ACM 22933.

U. S. Court of Military Appeals.

Jan. 31, 1983.

For Appellant: *Captain Kathleen G. O'Reilly* (argued); *Colonel George R. Stevens, Major Willard K. Lockwood* (on brief).

For Appellee: *Lieutenant Colonel Andrew J. Adams, Jr.* (argued); *Colonel James P. Porter, Lieutenant Colonel Bruce R. Houston* (on brief); *Colonel Kenneth R. Rengert; Captain Ronald R. Sticka, USAFR.*

*Opinion of the Court*

COOK, Judge:

The accused was tried by general court-martial, military judge alone, and was convicted, despite his pleas, of desertion; transferring marihuana; and using, possessing and transferring heroin (five specifications), in violation of Articles 85 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 885 and 934, respectively. He was sentenced to a dishonorable discharge, confinement at hard labor for 28 months, forfeiture of all pay and allowances, and reduction to airman basic. While disapproving findings of guilty of one specification of possessing and one of transferring heroin, the convening authority approved the sentence as adjudged. The Court of Military Review affirmed the approved findings and sentence.

We granted the accused's petition for review on this issue:

> WHETHER THE COURT–MARTIAL WHICH TRIED THE APPELLANT WAS WITHOUT JURISDICTION WITH RESPECT TO SPECIFICATIONS 1 AND 2 OF ADDITIONAL CHARGE I AND ADDITIONAL CHARGE II AND THE SPECIFICATION THEREUNDER BECAUSE THE APPELLANT HAD ALREADY BEEN TRIED BY A BRITISH CRIMINAL COURT.

We hold that the court-martial had jurisdiction over the offenses cited and affirm.

I

Article 44(a), UCMJ, 10 U.S.C. § 844(a), provides: "No person may, without his consent, be tried a second time for the same offense."

Paragraph 215*b*, Manual for Courts-Martial, United States, 1969 (Revised edition), explains:

> [T]he commission of certain acts may also constitute an offense under the code and an offense under State or foreign law. These offenses are not the same within the sense of Article 44. Thus, trial by a State or foreign court does not bar a subsequent trial by court-martial. However, the authority to try an accused by court-martial under those circumstances may be limited by regulations of the Secretary of a Department. Additionally, the authority to try an accused by court-martial following a trial in a foreign court may be limited by treaty or international agreement.

The specific limiting international agreement involved here is the Agreement Between the Parties to the North Atlantic Treaty Regarding the Status of Their Forces (NATO SOFA), 4 U.S.T. 1792, T.I.A.S. No. 2846 (effective date—August 23, 1953), which provides in Article VII, paragraph 8:

> Where an accused has been tried in accordance with the provisions of this Article by the authorities of one Contracting

Party and has been acquitted, or has been convicted and is serving, or has served, his sentence or has been pardoned, he may not be tried again for the same offence within the same territory by the authorities of another Contracting Party. However, nothing in this paragraph shall prevent the military authorities of the sending State from trying a member of its force for any violation of rules of discipline arising from an act or omission which constituted an offence for which he was tried by the authorities of another Contracting Party.

4 U.S.T. at 1802.

■ The interrelation of the two sentences of paragraph 8 has engendered conflicting views. The clear language of the first sentence precludes a trial for the same offense by the other contracting party—a recognition of the principle of "no double jeopardy." [1] However, the very breadth of the scope of Article 134, when read in combination with the second sentence, seems to lie in direct contradiction. [2] Article 134 is directed toward "all disorders and neglects to the prejudice of good order and discipline in the armed forces" and "all conduct of a nature to bring discredit upon the armed forces." In the view of at least one authority,

> any infraction of the criminal law of a receiving State could . . . be considered as an infraction of . . . Article [134]. Consequently, the restriction placed on the duality of prosecutions by paragraph 8 is more illusory than real. This paragraph poses so many conditions to the application of the maxim *non bis in idem* that we may safely state that any serviceman may be tried by the authorities of the receiving State *and* the authorities

of the sending States without paragraph 8 being violated.

Lazareff, *Status of Military Forces Under Current International Law* 233 (Sijthoff, Leyden 1971); *see also* Note, *Criminal Jurisdiction Over American Armed Forces Abroad,* 70 Harv.L.Rev. 1043, 1063 (1957); Snee and Pye, *Status of Forces Agreement—Criminal Jurisdiction* (1957) [hereafter cited as *Status*]; Snee and Pye, *A Report on the Actual Operation of Article VII of the Status of Forces Agreement* 50 (Georgetown Univ. Law Center 1956) [hereafter cited as *A Report*]. Indeed the Government has advanced this proposition as an alternative ground for affirming. However, such a broad interpretation would seem to wreak havoc with what appears to be the clear intent of the drafters of paragraph 8, particularly where the Article 134 charge is in reality a substantial restatement of the offense tried by the host country rather than some act related to, or growing out of, such offense, but more properly falling within the definition of an act "to the prejudice of good order and discipline." *United States v. Hughes,* 7 C.M.R. 803 (A.F.B.R.1953); *cf. United States v. Sinigar,* 6 U.S.C.M.A. 330, 20 C.M.R. 46 (1955). In addition, this case was tried and reviewed on the interpretation of paragraph 8 barring dual trials for the same offense, and in fact the convening authority disapproved two findings of guilty in reliance on this principle. *See United States v. Cadenhead,* 14 U.S.C.M.A. 271, 34 C.M.R. 51 (1963). Consequently, we shall interpret paragraph 8 in that manner even while recognizing that in certain circumstances an offense could be committed in violation of host-country law which could independently affect the discipline of the

1. LIV *International Law Studies 1961: NATO Agreements on Status,* para. 10, p. 104 (U.S. Naval War College 1966) [hereafter cited as *NATO Agreements on Status*]. The language proposed by the United States Delegation to the Juridical Subcommittee of the Working Group on Status, February 17, 1951, was:

> Where a primary right of jurisdiction has been exercised by the authorities of a Contracting Party, a trial of the accused by such authorities shall preclude the subsequent tri-

al for the same offence by the authorities of another Contracting Party.

However, this was rejected because it did not cover a situation where the trial was not carried forward to verdict. *Id.* at para. 7.

2. The second sentence was drawn from language proposed by the United States Representative. As originally stated, "any sentence rendered in the first trial" would "be taken into account." *Id.* at 176, para. 15.

sending state's armed forces. We believe that this is not such a case.

■ We also reject the proposition advanced by some that paragraph 8 was intended only to bar trial by the host country after trial by military authorities of the sending state.[3] *See A Report, supra* at 51.

■ Next, we must consider whether the accused has standing to assert an alleged violation of the treaty. *See United States v. Stokes,* 12 M.J. 229 (C.M.A.1982); *United States v. Whiting,* 12 M.J. 253 (C.M.A.1982). The general rule is that standing to contest an alleged treaty violation may not be assumed, but can only be asserted where the treaty clearly indicates an intention to create present enforceable rights for the individual. *See United States v. Whiting,* 9 M.J. 501, 509 (A.F.C.M.R.1980) (dubitante opinion), *rev'd.,* 12 M.J. 253 (C.M.A.1982); *Head Money Cases,* 112 U.S. 580, 598–99, 5 S.Ct. 247, 253–254, 28 L.Ed. 798 (1884); *Foster v. Neilson,* 27 U.S. (2 Pet.) 253, 315, 7 L.Ed. 415 (1829). Our reading of paragraph 8 and the records of the drafting committee convinces us that in emphasizing the principle of "no double jeopardy," the drafters intended to protect individual rights; we therefore conclude that the accused may properly assert a violation of the paragraph which purportedly prejudices his rights and interests. *United States v. Stokes* and *United States v. Whiting,* both *supra. See Status, supra* at 88–89.[4]

## II

Having determined the applicability of paragraph 8 to the instant charges, we must next decide whether the British charges included and encompassed the military charges. This determination is complicated by the fact that both the British "counts" and the American specifications are somewhat broad as to dates alleged and differ as to places.[5] The military specifications allege:

ADDITIONAL CHARGE I: Violation of the Uniform Code of Military Justice, Article 134.

Specification 1: In that AIRMAN FIRST CLASS ELZA L. GREEN, JUNIOR, United States Air Force, 48th Combat Support Group, did, at Royal Air Force Lakenheath, Suffolk, England, and in the Royal Air Force Lakenheath, Suffolk, England area, during the period of 1 December 1978 to 1 May 1979, wrongfully transfer marijuana.

Specification 2: In that AIRMAN FIRST CLASS ELZA L. GREEN, JUNIOR, United States Air Force, 48th Combat Support Group, did, between Royal Air Force Lakenheath, Suffolk, England and London, United Kingdom, during the period of 1 to 30 July 1979, wrongfully use a habit forming narcotic drug, to wit: heroin.

Specification 3: In that AIRMAN FIRST CLASS ELZA L. GREEN, JUNIOR, United States Air Force, 48th Combat Support Group, did, at Royal Air Force Lakenheath, Suffolk, England, on or about 2 August 1979, wrongfully have in his possession some amount, of a habit forming narcotic drug, to wit: heroin.

3. There is no Constitutional bar to trial by military courts after conviction by a foreign court for the same offense since the offenses would be against different sovereignties. *See United States v. Lanza,* 260 U.S. 377, 43 S.Ct. 141, 67 L.Ed. 314 (1922); *Ponzi v. Fessenden,* 258 U.S. 254, 42 S.Ct. 309, 66 L.Ed. 607 (1922).

4. The Working Group on Status (Juridical Subcommittee) noted that "when the Western Union Agreement was ... drawn up[,] [i]t had not been deemed necessary explicitly to include in the text of the Agreement a principle which was universally recognized, namely the principle of no double jeopardy." *NATO Agreements on Status, supra* at 104, para. 10. Later

the Subcommittee adopted "[a] new draft ... which, while safeguarding the principle of no double jeopardy, guaranteed that no offense would go unpunished." *Id.* at 105, para. 14. Thus, the drafters recognized the efficacy of the prohibition against double jeopardy.

5. The military specifications speak of marijuana and heroin, while the British counts speak of cannabis resin, cannabis oil, and diamorphine hydrochloride, their pharmacological equivalents. Diamorphine hydrochloride is a "Class A" controlled drug and cannabis is a "Class B" controlled drug under the Misuse of Drugs Act, 1971.

ADDITIONAL CHARGE II: Violation of the Uniform Code of Military Justice, Article 134.

\* \* \* \* \* \*

Specification 2: In that AIRMAN FIRST CLASS ELZA L. GREEN, JUNIOR, United States Air Force, 48th Combat Support Group, did, at Methwold, Norfolk, England, during the period of 1 to 30 July 1979, wrongfully use a habit forming narcotic drug, to wit: heroin.

\* \* \* \* \* \*

The British Indictments read as follows:

FIRST INDICTMENT.

*FIRST COUNT* Statement of Offence:—

Supplying a controlled drug, contrary to section 4(3)(a) of the Misuse of Drugs Act, 1971

Particulars of Offence:—

ELZA LEROY GREEN, on a day unknown between the 1st day of December, 1978 and the 6th day of August, 1979 at Mildenhall in the County of Suffolk or elsewhere unlawfully supplied to persons unknown a controlled drug of Class B, namely a quantity of Cannabis Resin.

*SECOND COUNT* Statement of Offence:—

Possessing a controlled drug with intent to supply it to another, contrary to section 5(3) of the Misuse of Drugs Act, 1971

Particulars of Offence:—

ELZA LEROY GREEN, on a day unknown between the 1st day of May, 1979 and the 3rd day of June, 1979 at Mildenhall in the County of Suffolk, had in his possession a controlled drug of Class B, namely a quantity of Cannabis Resin, with intent unlawfully to supply it to another.

*THIRD COUNT* Statement of Offence:—

Possession of a controlled drug, contrary to section 5(2) of the Misuse of Drugs Act, 1971

Particulars of Offence:—

ELZA LEROY GREEN, on a day unknown between the 1st day of May, 1979 and the 5th day of June, 1979 at Methwold in the County of Norfolk, unlawfully had in his possession a controlled drug of Class B, namely a quantity of Cannabis Resin.

SECOND INDICTMENT.

*FIRST COUNT* Statement of Offence:—

Possession of a controlled drug, contrary to section 5(2) of the Mususe [sic] of Drugs Act, 1971

Particulars of Offence:—

ELZA LEROY GREEN, on the 30th day of July, 1979 at Methwold in the County of Norfolk, unlawfully had in his possession a controlled drug of Class B, namely a quantity of Cannabis Resin.

*SECOND COUNT* Statement of Offence:—

Possession of a controlled drug, contrary to section 5(2) of the Misuse of Drugs Act, 1971

Particulars of Offence:—

ELZA LEROY GREEN, on the 30th day of July, 1979 at Methwold in the County of Norfolk, unlawfully had in his possession a controlled drug of Class A, namely a quantity of Lysergide.

*THIRD COUNT* Statement of Offence:—

Possession of a controlled drug, contrary to section 5(2) of the Misuse of Drugs Act, 1971

Particulars of Offence:—

ELZA LEROY GREEN, between the 1st day of July, 1979 and the 3rd day of August, 1979 at Methwold in the County of Norfolk and elsewhere, unlawfully had in his possession a controlled drug of Class A, namely a quantity of Diamorphine Hydrochloride.

*FOURTH COUNT* Statement of Offence:—

Possession of a controlled drug, contrary to section 5(2) of the Misuse of Drugs Act, 1971

Particulars of Offence:—

ELZA LEROY GREEN, on the 30th day of July, 1979 at Methwold in the County of Norfolk, unlawfully had in his possession a controlled drug of Class B, namely a quantity of Cannabis Oil.

*FIFTH COUNT* Statement of Offence:—

Supplying a controlled drug, contrary to section 4(3)(a) of the Misuse of Drugs Act, 1971

Particulars of Offence:—

ELZA LEROY GREEN, between the 1st day of July, 1979 and the 31st day of July, 1979 at Methwold in the County of Norfolk, unlawfully supplied to Wayne Lee German a controlled drug of Class A, namely a quantity of Diamorphine Hydrochloride.

*SIXTH COUNT* Statement of Offence:—

Supplying a controlled drug, contrary to section 4(3)(a) of the Misuse of Drugs Act, 1971

Particulars of Offence:—

ELZA LEROY GREEN, between the 1st day of December, 1978 and the 31st day of July, 1979 unlawfully supplied to Wayne Lee German a controlled drug of Class B, namely a quantity of Cannabis Resin.

*SEVENTH COUNT* Statement of Offence:—

Supplying a controlled drug, contrary to section 4(3)(a) of the Misuse of Drugs Act, 1971

Particulars of Offence:—

ELZA LEROY GREEN, on a day unknown between the 1st day of December, 1978 and the 31st day of July, 1979 unlawfully supplied to David John Gletne a controlled drug of Class B, namely a quantity of Cannabis Resin.

The British indictments were laid under the Misuse of Drugs Act 1971, C. 38, 41 Halsburys Statutes of England 878 (3d ed.). This act provides in pertinent part:

4. *Restriction of production and supply of controlled drugs*

(1) Subject to any regulations under section 7 of this Act for the time being in force, it shall not be lawful for a person—

(a) to produce a controlled drug; or

(b) to supply or offer to supply a controlled drug to another.

(2) Subject to section 28 of this Act, it is an offence for a person—

(a) to produce a controlled drug in contravention of subsection (1) above; or

(b) to be concerned in the production of such a drug in contravention of that subsection by another.

(3) Subject to section 28 of this Act, it is an offence for a person—

(a) to supply or offer to supply a controlled drug to another in contravention of subsection (1) above; or

(b) to be concerned in the supplying of such a drug to another in contravention of that subsection; or

(c) to be concerned in the making to another in contravention of that subsection of an offer to supply such a drug.

5. *Restriction of possession of controlled drugs*

(1) Subject to any regulations under section 7 of this Act for the time being in force, it shall not be lawful for a person to have a controlled drug in his possession.

(2) Subject to section 28 of this Act and to subsection (4) below, it is an offence for a person to have a controlled drug in his possession in contravention of subsection (1) above.

(3) Subject to section 28 of this Act, it is an offence for a person to have a controlled drug in his possession, whether lawfully or not, with intent to supply it to another in contravention of section 4(1) of this Act.

(4) In any proceedings for an offence under subsection (2) above in which it is proved that the accused had a controlled drug in his possession, it shall be a defence for him to prove—

(a) that, knowing or suspecting it to be a controlled drug, he took possession of it for the purpose of preventing another from committing or continuing to

commit an offence in connection with that drug and that as soon as possible after taking possession of it he took all such steps as were reasonably open to him to destroy the drug or to deliver it into the custody of a person lawfully entitled to take custody of it; or

(b) that, knowing or suspecting it to be a controlled drug, he took possession of it for the purpose of delivering it into the custody of a person lawfully entitled to take custody of it and that as soon as possible after taking possession of it he took all such steps as were reasonably open to him to deliver it into the custody of such a person. (5) Subection (4) above shall apply in the case of proceedings for an offence under section 19(1) of this Act consisting of an attempt to commit an offence under subsection (2) above as it applies in the case of proceedings for an offence under subsection (2), subject to the following modifications, that is to say—

(a) for the references to the accused having in his possession, and to his taking possession of, a controlled drug there shall be substituted respectively references to his attempting to get, and to his attempting to take, possession of such a drug; and

(b) in paragraphs (a) and (b) the words from "and that as soon as possible" onwards shall be omitted.

(6) Nothing in subsection (4) or (5) above shall prejudice any defence which it is open to a person charged with an offence under this section to raise apart from that subsection.

■ As should be noted, the British act does not make use of controlled drugs a criminal offense; rather it is concerned with supplying and unlawful possession or any possession with intent to supply. Thus, the military specifications alleging use of

heroin between RAF Lakenheath and London (specification 2, Additional Charge I) and use of heroin at Methwold, Norfolk (specification 2, Additional Charge II) concern offenses not criminal under British law. There are no corresponding British counts referring to these specifications. In addition, even if factually the British counts alleging "possession" were identical in time and place with the military specifications alleging "use"—which we will demonstrate later is not the case—the clear interest of the United States military in forbidding *use* of a harmful drug would permit its separate charging under the reservation of the second sentence of paragraph 8 since the use would be a violation of disciplinary rules peculiarly affecting the conduct of a military person; *see United States v. Trottier,* 9 M.J. 337 (C.M.A.1980),[6] even though such dual charging of use and possession *might* be considered multiplicious for sentencing if tried together by a United States military court. *See United States v. Smith,* 14 M.J. 430 (C.M.A.1983). For the purpose of our continued analysis we consider these two specifications to be legally without the scope of the British indictments.

### III

As shown above, the dates and places in the specifications and counts are not directly comparable. We must therefore look to the evidence introduced in support of both in order to determine whether there was any improper overlap.

■ At the accused's court-martial the double-jeopardy argument was made at a pretrial hearing before the taking of any evidence on the military charges. The military judge was asked to bar trial of the challenged specifications solely on the basis of facial similarities with the British counts. We agree that he was correct in overruling

**6.** "It is obvious that the ability of the civilian community to tolerate drug abuse is considerably different from the military. Indeed, with the possible exception of police and firemen, there is no exact counterpart to the requirement that servicemen be physically capable of

responding at any time to a recall to duty." *United States v. Tinley,* 2 M.J. 694, 697 (A.F.C. M.R.1976), *aff'd,* 4 M.J. 86 (C.M.A.1977), quoting from *United States v. Campbell,* 2 M.J. 689, 691–92 (A.F.C.M.R.1976), *rev'd,* 4 M.J. 94 (C.M.A.1977).

the accused's motion at that time pending receipt of evidence which could (and did) more specifically identify dates, places, and people involved. In passing, we also note that the motion was not renewed at the conclusion of the prosecution's case even though upon review by the convening authority it was determined that specifications 1 and 3 of Additional Charge II were included within the British indictments.

Also specifications 1 and 3 of Additional Charge I allege the offenses as taking place at Royal Air Force Lakenheath, or in the case of specification 1, "in the Royal Air Force Lakenheath ... area," whereas the British counts are alleged as occurring at English towns except for the Sixth count of the Second Indictment. We are aware that "Royal Air Force Lakenheath" refers to the air base where the accused was stationed and the towns referred to are places off-base where military personnel live on the local economy.

The evidence in support of the military charges was supplied at trial by Sergeant Wayne L. German, who was for all intents and purposes the accused's partner-in-crime. As to specification 1, Additional Charge I, German testified that he and the accused exchanged hashish in the dormitory at RAF Lakenheath on numerous occasions between December 1978 and the end of April 1979. He also observed the accused transfer "amounts" of hashish to "[v]arious other people living in the dormitory." As to specification 2 of the same Charge, German testified that while returning from London in his automobile with the accused, the latter suggested "do[ing] some smack." So the two "pulled off the ... road and" snorted "a couple of lines of heroin." As to specification 3, German testified that the accused visited him in the hospital after he had been injured in an automobile accident. When the accused told German that the police had searched their house the night of the accident, German returned to the accused some heroin which he had hidden in his wallet so that the police would not find it. Concerning the remaining specification of Additional Charge II, German testified that his "first contact with heroin" occurred

in July, 1979, at his home in Methwold when the accused "line[d] a smack ... and I took it." At that time and on approximately six more occasions during July, 1979, German saw the accused use smack. German's familiarity with the appearance and effects of the various drugs was well established as he was both a dealer and a user.

The counts in the two British indictments grew out of two separate searches of off-base houses occupied by American airmen. The first occurred on June 2, 1979, at Flat 1A Woodlands Park, Mildenhall, Suffolk, and was conducted by Detective Constables Webb and Kerry pursuant to the Misuse of Drugs Act, 1971. The accused was present at the flat when the British officers entered. Three ounces of cannabis resin were found in the living room. After first denying that it belonged to him, the accused later admitted to Webb that the cannabis was his and that he had taken it to the flat to sell to Arden, the tenant. This is the evidence supporting the First Count. The accused stated that the three ounces was all that was left from a pound of cannabis which he had bought earlier in the week in London. The accused admitted that he had "sold the rest of it ... to G.I.'s ... [i]n Mildenhall mainly." This is the evidence supporting the Second Count. On June 4, 1979, the accused returned to the Mildenhall Police Station to "correct" a portion of his earlier statements. There he told Detective Constable Curtis that he had lied and that he had about three ounces of cannabis in his home at Methwold. Curtis accompanied the accused to his house at Methwold and recovered three "polythene" bags containing cannabis from under the accused's bed. This is the evidence supporting the Third Count.

The activities which prompted the Second Indictment began on July 30, 1979, when Police Constable Malster "attended the scene of an [automobile] accident" at Barton Mills in which Sergeant German was injured. An examination of the rear seat of German's car disclosed a "polythene" bag, which, upon being opened, was found to contain three bags "each containing a

brown substance." Constable Malster delivered these bags and other items to Detective Constable Seaman of the Norfolk Drug Squad. Some six hours after the automobile accident, Seaman, pursuant to the Misuse of Drugs Act 1971, secured a search warrant for the house at 28, Old Feltwell Road, Methwold, the home of the accused and Sergeant German. He executed the warrant in the company of Police Constable Pimlott and Investigators Cole and Hartley of the Air Force Office of Special Investigations (OSI). After forcing the door of the house, the officers found the accused in the bedroom. Seaman asked if the accused had "anything here you want to surrender before we search"; the accused replied that he had "some hash." The accused then turned over "a bag containing pieces of brown substance" from his bedroom and more "pieces of brown substance" from the living room. These items became the substance of the offense alleged in the First Count of the Second Indictment. Seaman then arrested the accused and with Pimlott began a search of the house.

"Investigator COLE . . . came out of the bedroom holding a piece of cellophane containing a piece of white paper with shapes printed thereon." The accused identified this as "three hits" of "acid." This was the subject of the Second Count. Cole also found a wooden box in the lid of which was "a piece of folded newspaper containing a white substance." The accused identified the substance as "smack." This was the subject of the Third Count.

Pimlott found "a piece of brown paper with brown substance thereon" in the cupboard and Cole found other pieces of brown substance in the bedroom. These and other pieces of "brown substance" became the subject of the Fourth Count.

On the 2d of August 1979, Seaman, accompanied by Cole, interviewed German at the Lakenheath base hospital. After being "cautioned," German related that he had possessed "some smack" "between Sunday night and the time of the accident" (July 29–30, 1979) which had been supplied by the accused. German said that he "flushed it away," but actually it was the heroin which he gave to the accused in the hospital previously. This was the subject of the Fifth Count.

After the search, while the accused was "in the cells," he was reinterviewed by Seaman. The accused told Seaman that he had purchased "three pounds" of cannabis "last Tuesday" and had given German "a pound and a quarter," of which four ounces was to be sold on his behalf, and had sold and given a pound to "CRAZY" Dave Gletne. This account was verified by German and Gletne in separate interviews with Seaman. These transfers constituted the "supplying" alleged in the Sixth and Seventh Counts.

■ It is clear that the British counts were based on factual situations different from the military specifications. The closest similarity was the exchange of heroin from German to the accused in the hospital (specification 3, Additional Charge I, and Fifth Count, Second Indictment). Although the granted issue did not attack this specification, we will consider it nonetheless. Noting the difference in underlying facts, it would appear that the British count dealt with the initial supplying of heroin by the accused to German, whereas the military specification concerned the return of some of the heroin by German to the accused so that the former could escape detection of the drug in his wallet from a search which both knew was imminent. Consequently, we do not hold them to be within the proscription of paragraph 8. It is evident that the British authorities were reacting to crimes committed on their soil, whereas the military was responding to crimes committed on the base at RAF Lakenheath and to the use of heroin off-base by two military personnel.[7]

### IV

Further complicating the matter at issue is a British criminal procedure identified at

---

7. The British court sentenced the accused to six months each for counts 1 and 2 of the First Indictment and six months for each count of the Second Indictment but ruled that all sentences would run *concurrently*.

trial through the stipulated testimony of Ernle Money, Barrister at Law, who defended the accused at his British trial. Mr. Money described the procedure in this manner:

> As a matter of English criminal law the Crown frequently brings only specimen charges in relation to a course of conduct by an accused. This frequently occurs in drugs [sic] cases where it is clear from the evidence that a large number of offences have occurred over a period of time. In such cases the Court is able to sentence and deal with a Defendant for all of the offences disclosed by the evidence and the matters within the Court's knowledge.
>
> Authority for this statement is to be found in R—v—Price, CLR July 79 p 468 and R—v—Depledge, CLR November 79 p 733.
>
> In this case in my view it is clear from his comments that the Judge took into account when sentencing Green the whole

of the defendant's conduct known to him and not merely the facts of the offences listed in the Indictments.

Apparently as an ancillary to the "specimen charges" procedure is the practice of the defendant serving on the police other matters which he wishes "taken into consideration" (T.I.C.).[8] We shall consider the two concepts separately.

 We have obtained copies of the decisions referenced by the barrister in his stipulated testimony.[9] The first, *Regina v. Price*, (1978) 68 Cr.App.R. 154, 160, is a case brought against three individuals (Mills, White, and Price) for commercial bribery, in violation of the Prevention of Corruption Act 1906 and Prevention of Corruption Act 1916 which proscribe the corrupt taking by an agent of "any gift or consideration as an inducement or reward for" himself in conducting "his principal's affairs or business." Price was convicted of one count of the original indictment, number 14. This count alleged that Price had "corruptly accepted

**8.** Mr. John, accused's British solicitor, explained the practice as follows:

> There is a formal procedure for taking offenses into consideration. I think I can assist you by explaining this is not a statutory development but one that has been going on any number of years whereby a practice has become adopted there. In the event that the police have other matters outstanding against a defendant, they will frequently have them dealt with by way of what are called TIC's—"Taken Into Consideration." That's the essence of the abbreviation. The accepted practices are that these forms are signed by the defendant and are given to the court, and they are given to the prosecution, and all parties have a copy of them. They usually emanate from the prosecution rather than the defense. Then the other offenses are read by the court clerk to the defendant, and he is asked whether he wants them taken into consideration. It is not, as such, a formal situation. It is one, as I have stated, that has developed over any number of years, and the way it is usually done is in the manner I have described. It is usual, however, for the documents to be typed onto a set form which contains a number of receipt, acknowledging that the document is signed by one person and are generally presented on a recognized form, and the defense not having access to these forms. It would cause a delay for these forms to be obtained, and, during the trial,

the TIC's were mentioned by the counsel for the defendant.

**9.** The evidentiary rules in effect at the court-martial provided that:

> [i]n determining foreign law, the military judge ... should require that it be established either by the testimony of a qualified person who is familiar with that law or by the presentation of materials or sources indicated below.
>
> Any material or source received by the court for use in determining foreign law, or pertinent extracts therefrom, should be included in the record of trial as an exhibit, but testimony as to foreign law should appear in the record where testimony usually appears.

Para. 147*b*, Manual for Courts-Martial, United States, 1969 (Revised edition). The two case citations in the record are to the Criminal Law Review, a British publication which digests recent cases. However, even this material was not made part of the record. Further, the question of British practice is hardly clarified by a single page digest of the cases. In future cases of this sort, fore: gn cases should be cited to complete collections or copied and included as part of the record of trial. It would also be desirable to have such foreign law materials in the form of testimony rather than being intermingled with argument, as it was here. Of course, the party alleging double jeopardy has the burden of producing such materials as are relevant.

from" another "a gift or consideration, namely a sum of money ... for having done or forborne to do acts in relation to the affairs or business of" his employer between July 28, 1967 and March 29, 1970. The "count was laid in that form because ... the prosecution was unable to specify any particular amount upon any particular date which had been ... received by the" defendant. "Price gave evidence" of "a large number of occasions upon which" amounts "of £50 were" given "to him, making the aggregate ... £5,450." The trial judge, with the prosecution's consent, "elected to take one payment of £50 and use it as a sample upon which the view of the jury could be tested." This was done since

[s]o far as the defendant was concerned, he put forward the same excuse for each of these payments, namely that they were not received as a bribe and were not received as a reward for past favours, but they were received, according to him, for work done by him in his private capacity on the consultancy basis

for the firm seeking to do business with Price's principal. The jury rejected Price's testimony. The trial "judge then took it upon himself to sentence this man not just for one £50, but for the whole of the aggregate of these £50, namely £5,000 plus, of which, he took the view, the jury, by their verdict, had inevitably convicted him." Price argued on appeal "that this was wrong" and "that the judge should have confined himself to punishing this man for the one sum of £50 and was wrong to use the rest of the £5,000 odd as a basis of punishment." *Id.* at 161.

The Court of Appeal affirmed. It approved the rationale of the trial judge that the payments had been accepted regularly by the defendant over a period of years and that his explanation of the payments had been rejected by the jury. The trial judge said:

I am sentencing him on that basis, because I am quite clear in my mind that I am dealing with the reality of the situation which is that this merely represents one part of an ascertainable number of offences which he committed. They are offences with which he is not charged and cannot be charged again because this is specifically a specimen count."

However, the Court of Appeal noted: "Indeed if one returns to the count, as I have already done, that remains a general count and was never amended .... The correct basis was adopted for sentencing." *Id.* at 163.

Thus, it is not entirely clear whether the trial judge was upheld on the basis of sentencing for all of the offenses based upon a jury verdict on "a specimen count" or whether the "specimen count" itself was broad enough to permit the taking of evidence of all of the payments over an extended period of time and using the totality of the presentation as a basis for sentencing.[10]

The second cited case, *Regina v. Depledge,* (1979) 1 Cr.App.R. (S.) 183, deals with a different solution. There the defendant was tried separately from several other co-conspirators for conspiracy to rob. The other conspirators were tried before the same judge and received lesser sentences. In passing sentence on Depledge, the trial judge remarked, "I am satisfied

---

**10.** The Commentary in Criminal Law Review is critical of the holding.

This decision appears to represent a severe blow to the development of sound procedural principles in the context of sentencing. In a series of cases arising in a variety of ways, the Court has held that an offender should not be sentenced on the basis that he has committed an offence, unless he has either been convicted by the jury of that offence or has admitted it. (*See* Thomas, *Principles of Sentencing* (2nd ed.), pp. 366–369). The rea-

son for this principle is the obvious one that to do otherwise would be to bypass the whole process of trial by jury ...

The question whether the issues for the jury to decide in relation to each incident are similar or different seems to be equally irrelevant, when set alongside the inherent injustice of sentencing on the basis of allegations which are denied and which have not been the subject of a verdict.

[1979] Crim.L.R. at 468–69.

that you were the ringleader in this conspiracy and I also regard you as being a professional criminal." This was based upon the evidence heard by the judge in the other cases. On appeal it was argued that the trial "judge was not entitled to take into account, in passing sentence on this appellant, anything which had come to his notice because he had tried the two co-accused upon whom he had passed lesser sentence." Lord Justice Bridge held that

> it is difficult for the judge to put out of his mind all he knows which has come to him as a consequence of the separate trials. Any judge is bound, we think, to take an overall view and try to determine what are the appropriate sentences in the light of the view he takes of the totality of the evidence he has heard.

*Id.* at 185.[11]

It is not without some trepidation that we attempt to interpret not only British law but British practice. However, we must consider the effect of such law and practice as it interrelates with the provisions of our own law and the meaning cf paragraph 8 of the NATO SOFA.

First of all, it is not clear that the cited cases stand squarely for the proposition so lucidly argued by learned counsel.[12] The accused pleaded guilty to all of the counts in the two indictments and hence no jury verdict on "specimen counts" was involved. Second, it is also not clear that the British judge was sentencing on the basis of evidence of crimes other than those discovered

in the two searches and the statements of the accused and German which were made as a result thereof. When the accused sought to have three additional offenses relating to possession of heroin at Methwold between 1 July 1979 and 3 August 1979, supplying heroin at Methwold between 1 July 1979 and 31 July 1979, and supplying cannabis resin to German and Gletne between 1 December 1978 and 6 August 1979, "taken into consideration" by the judge, the trial judge remarked:

> [I]t does not therefore seem necessary to formally read the T.I.C.'s but I note Mr. Money the attempt has been made to introduce them and give your client full credit for his frank willingness to admit further offences.

Crown counsel had remarked that "[t]here . . . [was] certainly no question of Airman Green being the subject of any further charges." Further, Crown counsel stated: "It is [u]ndesirable that this court should frustrate proceedings of the U.S. military." Thus, neither factually nor legally is it established that the trial judge had "taken into consideration" any of the matters which gave rise to the military charges. For all intents and purposes based upon the record before us, it appears that the Crown judge was sentencing for crimes occurring on British soil and not for those occurring at RAF Lakenheath. Additionally, as noted before, the two use offenses charged under the Code are not crimes under the British statute and presumably would not

---

11. The Commentary in Criminal Law Review is likewise critical of this decision.

> It is submitted that this ruling is inconsistent with principle and previous authority. It is surely wrong to sentence an offender on the basis of allegations or evidence which he has had no opportunity to challenge or refute, and the judge's difficulties in distinguishing which evidence has been given against which defendant cannot be any greater than those of the jury in considering verdicts when part of the evidence is admissible against one defendant only. Previous decisions of the Court clearly point to a different principle, that the sentencer must sentence a particular defendant only on the basis of the evidence that has been given against him . . . It is submitted that where joint offenders have

been tried separately, or one has pleaded guilty and the other has been convicted after a trial, and different versions of the facts have emerged, a judge wishing to sentence one defendant on the basis of facts given in the course of the trial of the other defendant should have the relevant evidence called against the first defendant before sentencing him.

[1979] Crim.L.R. 733–34.

12. *See* nn. 8 and 9, *supra*. In fairness to the trial participants who apparently only had access to the summarizations in the Criminal Law Review, we note that the summarizations more clearly support the proposition for which they were cited than does the full text of the opinion.

be "taken into consideration" for sentencing or any other purpose.

One other matter convinces us that the British convictions do not bar trial of the military charges. Paragraph 8 speaks of an accused being "tried" and "serving . . . his sentence" for the same offenses. The word "trial" is defined as:

A judicial examination and determination of issues between parties to action, [citation omitted]; whether they be issues of law or of fact, [citation omitted]. A judicial examination, in accordance with law of the land, or a cause, either civil or criminal, of the issues between the parties, whether of law or fact, before a court that has proper jurisdiction.

*Black's Law Dictionary,* 1348 (5th ed. 1979). The word "sentence" is defined as:

The judgment formally pronounced by the court or judge upon the defendant after his conviction in a criminal prosecution, imposing the punishment to be inflicted. Judgment formally declaring to accused legal consequences of guilt which he has confessed or of which he has been convicted. The word is properly confined to this meaning.

*Id.* at 1222.

It would appear that the British practice of having uncharged or untried misconduct "taken into consideration" for sentencing purposes would not fit within the classic definition of "tried" offenses which would be barred by paragraph 8. This would be so even if the offenses "considered" in determining sentences were identical to those constituting the military charges since there would have been no trial of them.

In summary, we conclude that the British conviction did not encompass the same offenses underlying the military charges either factually or legally in the sense of paragraph 8 of Article VII, NATO SOFA. Therefore, the court-martial was not barred from trying the accused for these offenses.

The decision of the United States Air Force Court of Military Review is affirmed.

Chief Judge EVERETT and Judge FLETCHER concur.